Peter M.K. Frost, *pro hac vice*
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
Tel: 541-485-2471
Fax: 541-485-2457
frost@westernlaw.org

Marc D. Fink, *pro hac vice*
Center for Biological Diversity
4515 Robinson Street
Duluth, Minnesota 55804
Tel: 218-525-3884
Fax: 218-525-3857
mfink@biologicaldiversity.org

Lisa T. Belenky (CA Bar No. 203225)
Center for Biological Diversity
1095 Market St., Suite 511
San Francisco, California 94103
Tel: 415-436-9682 x 307
Fax: 415-436-9683
lbelenky@biologicaldiversity.org

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| CITIZENS FOR BETTER FORESTRY, et al. | ) | Case No: 3:07-cv-3831-MJJ |
| | ) | |
| Plaintiffs, | ) | **PLAINTIFFS' MOTION FOR SUMMARY** |
| | ) | **JUDGMENT AND INJUNCTIVE RELIEF** |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| AGRICULTURE, et al. | ) | Date: Tuesday, June 10, 2008 |
| | ) | Time: 2:00 p.m. |
| Defendants. | ) | Courtroom: 11 |
| | ) | Hon. Martin J. Jenkins |

Table of Contents.

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.      USDA's Decision Constitutes Final Agency Action Pursuant to the APA . . . . . . . . . . . . . . . . 10

II.     USDA's Decision Violates the APA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III.    USDA's Decision Violates NEPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        A.      Background on NEPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        B.      USDA's Decision Constitutes Federal Action under NEPA . . . . . . . . . . . . . . . . . . . . . . 17

        C.      The Courts Have Already Determined that the 2000 Rule Violates NEPA. . . . . . . . . . . 18

        D.      USDA Has Not Assessed the Environmental Effects of its Decision to Reinstate the 2000 Rule, And Has Not Cured the Legal Deficiencies with the 2000 Rule. . . . . . . . . . . . . . 19

        E.      USDA Failed to Provide a Convincing Statement of Reasons That No NEPA Analysis Was Required Before it Reinstated the 2000 Rule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

IV.     The Court Should Enjoin the Forest Service From Further Implementing the 2000 Rule Prior to Curing the Procedural Deficiencies and Allowing Public Notice and Comment. . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

1

Table of Authorities.

2

Cases:

3
4

*Alsea Valley v. Dep't of Commerce*, 358 F.3d 1181 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

6

*Alaska Ctr. For the Env't v. U.S. Forest Service*, 189 F.3d 851 (9th Cir. 1999) . . . . . . . . . . . . . . . 20, 21

7

*Batterson v. Marshall*, 648 F.2d 694 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13

8
9

*Bennett v. Spear*, 520 U.S. 154 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

10

*Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . 9, 16

11

*California v. Norton*, 311 F.3d 1162 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

12

*Ciba-Geigy Corp. v. EPA*, 801 F.2d 430 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

13
14

*Citizens for Better Forestry v. U.S. Dept. of Agriculture*, 341 F.3d 961
(9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3-5, 9, 14, 18, 19

15
16

*Citizens for Better Forestry v. U.S. Dept. of Agriculture*, 481 F.Supp.2d. 1059
(N.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7, 11, 17, 20

17
18

*Citizens for Better Forestry v. U.S. Dept. of Agriculture*, 497 F.Supp.2d 1062
(N.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 18, 19

19

*Citizens for Better Forestry v. U.S. Dept. of Agriculture*, 2007 WL 1970096 (N.D. Cal. July 3, 2007) . . 8

20

*Consumer Energy Council v. Federal Energy Regulatory Comm'n*, 673 F.2d 425 (D.C. Cir. 1982) . . . 15

21

*D.H. Blattner & Sons, Inc. v. Secretary of Labor*, 153, F.3d 1102 (9th Cir. 1998) . . . . . . . . . . . . . . . . 15

22
23

*Earth Island Institute v. U.S. Forest Serv.*, 442 F.3d 1147 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . 4

24

*Ecology Ctr. v. Austin*, 430 F.3d 1057 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

25

*Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489 (9th Cir. 1995) . . . . . . . . . . . . . . . . . 21

26
27

*Her Majesty the Queen in Right of Ontario v. U.S. Envtl. Protection Agency*, 912 F.2d 1525
(D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

28

*High Sierra Hikers v. Blackwell*, 390 F.3d 630 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Idaho Sporting Congress v. Thomas*, 137 F.3d 1146 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Indus. Customers of NW Utils. v. Bonneville Power Admin.*, 408 F.3d 638 (9th Cir. 2005) . . . . . . . . 11

*Inland Empire Public Lands Council v. U.S. Forest Serv.*, 88 F.3d 754 (9th Cir. 1996) . . . . . . . . . . 3, 4

*Jones v. Gordon*, 792 F.2d 821 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Mobile Oil Corp. v. U.S. Environmental Protection Agency* ("EPA"), 35 F.3d 579
(D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*National Family Planning & Reprod. Health Ass'n v. Sullivan*, 979 F.2d 227 (D.C. Cir. 1992) . . . . . . 15

*National Parks Conservation Assn. v. Babbitt*, 241 F.3d 722 (9th Cir. 2001) . . . . . . . . . . . . . . . . . 21, 22

*National Wildlife Federation v. Clark*, 577 F. Supp. 825 (D. D.C. 1984) . . . . . . . . . . . . . . . . . . . . . . . 13

*NRDC v. Duvall*, 777 F. Supp. 1533 (E.D. Cal. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Oregon Natural Desert Assoc. v. U.S. Forest Service*, 465 F.3d 977 (9th Cir. 2006) . . . . . . . . . . . 10-12

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Save the Yaak Committee v. Block*, 840 F.2d 714 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Scientists' Institute for Public Information v. Atomic Energy Comm'n*, 481 F.2d 1079
(D.C. Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 21


Statutes:

5 U.S.C. § 551(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5 U.S.C. § 551(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

5 U.S.C. § 551(13) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5 U.S.C. § 553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

5 U.S.C. § 553(b)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

5 U.S.C. § 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5 U.S.C. § 706(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 21

5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

5 U.S.C. § 706(2)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

16 U.S.C. § 475 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

16 U.S.C. § 1604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

16 U.S.C. § 1604(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

16 U.S.C. § 1604(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 15, 22

16 U.S.C. § 1604(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. § 4332(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16


Federal Register:

44 Fed. Reg. 53,928 (Sept. 17, 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

47 Fed. Reg. 7678 (Feb. 22, 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

47 Fed. Reg. 43,026 (Sept. 30, 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

64 Fed. Reg. 54,074 (Oct. 5, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

65 Fed. Reg. 67,514 (Nov. 9, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5

66 Fed. Reg. 27,552 (May 17, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

67 Fed. Reg. 35,431 (May 30, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

67 Fed. Reg. 72,770 (Dec. 6, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15, 20

69 Fed. Reg. 58,055 (Sep. 29, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

70 Fed. Reg. 1022 (Jan. 5, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6, 13, 15, 22

70 Fed. Reg. 1023 (Jan. 5, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

72 Fed. Reg. 48,514 (August 23, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Regulations:

36 C.F.R. § 219.1 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

36 C.F.R. § 219.10(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

36 C.F.R. § 219.19 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

36 C.F.R. § 219.27 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

40 C.F.R. § 1500.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

40 C.F.R. § 1501.3(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

40 C.F.R. § 1501.4(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

40 C.F.R. § 1508.18(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

40 C.F.R. § 1508.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Legislative History:

122 CONG. REC. 5618 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Plaintiffs Citizens for Better Forestry, et al. ("Citizens") hereby respectfully notice this motion for summary judgment, to be heard before the Honorable Martin J. Jenkins, on Tuesday, June 10, 2008, at 2:00 p.m., in Courtroom 11, 19th Floor, U.S. Courthouse, 450 Golden Gate Avenue, San Francisco, California. Citizens seek a declaratory judgment that Defendants United States Department of Agriculture et al. ("USDA") violated the Administrative Procedure Act ("APA") and National Environmental Policy Act ("NEPA"), as specified below, and an injunction to remedy those violations.

## INTRODUCTION

Citizens challenge USDA's decision in April 27, 2007, to reinstate nationwide regulations under the National Forest Management Act ("NFMA") that both this Court and the Ninth Circuit have already ruled were promulgated in violation of NEPA. When Congress enacted NFMA in 1976, it directed USDA to promulgate regulations to implement the Act. 16 U.S.C. § 1604(g). In 1982, USDA promulgated regulations that governed the content of forest plans and the permissibility of site-specific activities in the national forest system for over two decades. 47 Fed. Reg. 43,026 (Sept. 30, 1982) ("1982 Rule"). USDA revised the regulations in 2000, 65 Fed. Reg. 67,514 (Nov. 9, 2000) ("2000 Rule"), but failed to allow public comment on the environmental assessment prepared for the 2000 Rule, in violation of NEPA. *Citizens for Better Forestry v. U.S. Dept. of Agriculture*, 341 F.3d 961, 970 (9th Cir. 2003). In 2005, USDA withdrew the 2000 Rule in its entirety, and simultaneously published a new rule that again revised the regulations. 70 Fed. Reg. 1022 & 1023 (Jan. 5, 2005) ("2005 Rule"). This Court held that USDA violated NEPA, the Endangered Species Act ("ESA") and the Administrative Procedure Act ("APA") when it promulgated the 2005 Rule, and enjoined USDA from implementing it. *Citizens for Better Forestry v. U.S. Dept. of Agriculture*, 481 F.Supp.2d. 1059 (N.D. Cal. 2007).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

After the injunction, on April 27, 2007, USDA decided to reinstate the 2000 Rule. USDA issued nationwide direction to all Regional Foresters that states that "[t]he 2000 planning rule, including its transition provisions as clarified by the 2004 interpretative rule, is now in effect." Declaration of Regis Terney, Ex. A (dkt. # 31). As result, the 2000 Rule currently applies to site-specific projects across the national forest system, and provides that when the agency implements these projects, it must "consider" (but not necessarily apply) the best available science.

Citizens challenge USDA's decision in two respects. First, even though USDA formally withdrew the 2000 Rule in its entirety in 2005, the 2007 direction reinstates the 2000 Rule without any public notice, comment, or involvement, which violates the APA. Second, even though this Court and the Ninth Circuit ruled that USDA violated NEPA in promulgating the 2000 Rule, USDA has done nothing to cure the NEPA deficiencies regarding the 2000 Rule, and it reinstated the 2000 Rule without considering or disclosing any environmental impacts, which violates NEPA. Citizens seek a declaratory judgment that USDA's decision violates the APA and NEPA, and injunctive relief to prohibit USDA from further implementing the 2000 Rule.

## STATEMENT OF ISSUES

1.      Did USDA violate the APA by deciding to reinstate the 2000 Rule, which courts have held was illegally promulgated, without providing any opportunity for public notice or comment?

2.      Did USDA violate NEPA by failing to publicly consider or disclose the environmental effects of the 2000 Rule, before deciding to reinstate it?

3.      Should USDA be enjoined from further implementing the 2000 Rule?

1

**STATEMENT OF FACTS**

2

3        The national forest system includes 192 million acres of land (about 8% of the United States) in

4    44 states, Puerto Rico, and the Virgin Islands, including 155 national forests and 20 national grasslands.

5    67 Fed. Reg. 72,770 (Dec. 6, 2002).  Although Congress created the national forest system to "improve

6    and protect" federal forests, 16 U.S.C. § 475, commercial logging on national forests substantially

7    increased after World War II.  44 Fed. Reg. 53,928, 53,935 (Sept. 17, 1979).  Public concern about

8    excessive clearcutting led Congress to enact NFMA in 1976 as a "fundamental reform" of the laws

9    governing national forests.  122 Cong. Rec. 5618-19 (1976).  Congress focused its reform effort on

10   requiring long-range planning, providing public participation, and establishing standards and guidelines

11   for managing forests and non-timber resources.  16 U.S.C. § 1604.  As noted by Senator Humphrey, a

12   principal sponsor of NFMA: "The days have ended when the forest may be viewed only as trees and

13   trees viewed only as timber.  The soil and the water, the grasses and the shrubs, the fish and the wildlife,

14   and the beauty that is the forest must become integral parts of resource managers' thinking and actions."

15   122 Cong. Rec. 5618-19 (1976).

16

17

18       NFMA establishes a "three-tiered approach to forest management." *Citizens for Better Forestry*

19   *v. U.S. Dept. of Agriculture*, 341 F.3d 961, 965 (9th Cir. 2003).  "National uniform regulations

20   promulgated by [USDA] constitute the highest tier of regulatory oversight of the forest management

21   system and govern the development and revision of the regional and local plans." *Id.* (citing 16 U.S.C. §

22   1604(g)).  These regulations "set broad guidelines (to be followed when preparing regional and site-

23   specific plans) regarding plant and animal species conservation, timber management, and water

24   management." *Id.; Inland Empire Public Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 757 (9th Cir.

25   1996) (stating that NFMA imposes substantive requirements which are promulgated as regulations);

26

27

28

*Earth Island Institute v. U.S. Forest Serv.*, 442 F.3d 1147, 1173 (9th Cir. 2006) ("[S]ubstantive requirements of the NFMA [are] designed to ensure continued diversity of plant and animal communities and the continued viability of wildlife in the forest.") (citing *Ecology Ctr. v. Austin*, 430 F.3d 1057, 1063 (9th Cir. 2005)).

The second tier consists of "land and resource management plans" ("forest plans") for each unit of the national forest system. *Citizens for Better Forestry*, 341 F.3d at 966 (citing 16 U.S.C. § 1604(a)). "These plans operate like zoning ordinances, defining broadly the uses allowed in various forest regions, [and] setting goals and limits on various uses (from logging to road construction)." *Id.* NFMA regulations dictate both the content of and the process by which forest plans are adopted. *Id.* At the third and lowest tier "are the so-called 'site-specific' plans, which are prepared to effect specific, on-the-ground actions; these plans must be consistent with both sets of higher-level rules." *Id.* (citing 16 U.S.C. § 1604(I)).

In 1979, USDA promulgated the first set of regulations for the national forest system. *Citizens,* 341 F.3d at 966. The 1979 Rule was accompanied by "a full EIS analyzing the environmental impact of the regulation." *Id.* at 966 (citing 44 Fed. Reg. 53,928 (Sept. 17, 1979)). In 1982, USDA substantially revised the 1979 Rule. *Citizens*, 341 F.3d at 966. USDA analyzed the environmental effects of the revisions in an "environmental assessment" ("EA") under NEPA, and invited public comment on both the proposed revisions and the EA. *Id.* (citing 47 Fed. Reg. 7678, App. A at 7694 (Feb. 22, 1982)).

The 1982 Rule "set out a comprehensive approach to forest management, implementing the statutory directive." *Citizens,* 341 F.3d at 966. The 1982 Rule established specific standards and guidelines for developing, adopting, and revising forest plans, 36 C.F.R. § 219.1 (1982), and for undertaking site-specific actions. *Citizens*, 341 F.3d at 966; *see Inland Empire*, 88 F.3d at 760 n.6

(rejecting agency's argument that the rule did not apply to site-specific activities).  The 1982 Rule

imposed specific duties to preserve and restore wildlife, including that "wildlife habitat shall be managed

to maintain viable populations," and defining a viable population as "one which has the estimated

numbers and distribution of reproductive individuals to *insure* its continued existence is well distributed

in the [relevant] area."  *Citizens*, 341 F.3d at 966 (citing 36 C.F.R. § 219.19 (1982)) (emphasis original).

The 1982 Rule also "contained 'minimum specific management requirements,' setting forth mandatory

directives which all [forest plans] must follow, and specific, quantifiable baselines below which no

[forest plan] or site-specific plan can fall."  *Id.* (citing 36 C.F.R. § 219.27 (1982)).

In 1999, USDA proposed a revision of the 1982 Rule.  64 Fed. Reg. 54,074 (Oct. 5, 1999).

However, "[u]nlike the previous draft plan development rules, the proposed rule did not include any

analysis of its environmental impact and [USDA] did not specifically solicit comments on this matter."

*Citizens*, 341 F.3d at 967.  Further, USDA "never completed any 'biological assessment' of the rule's

impact on endangered species under the [ESA], nor did it engage in formal consultation with the

Secretaries of the Interior or Commerce."  *Id.*  On November 9, 2000, USDA published the 2000 Rule,

which was "not accompanied by any environmental or endangered-species analysis," although it noted

the existence of an EA.  *Id.*  The 2000 Rule contained a transitional provision allowing agency officials

to comply with either the 1982 Rule or the 2000 Rule for forest plans they were already revising when

the 2000 Rule was promulgated.  *Citizens*, 341 F.3d at 968 (citing 65 Fed. Reg. 67,514, 67,579).  The

2000 Rule provided that the 1982 Rule would continue to govern site-specific actions until November 9,

2003, after which they were to conform to the 2000 Rule.  65 Fed. Reg. at 67,563.

Citizens and other conservation groups filed suit to challenge the 2000 Rule.  *Citizens*, 341 F.3d

961.  The Ninth Circuit recognized that the 2000 Rule "substantially modified the 1982 Rule in a

number of ways," including relaxing the species "viability" requirement and eliminating many of the "minimum specific management requirements" that were part of the 1982 Rule. *Citizens*, 341 F.3d at 967-968 & 972. The Ninth Circuit held that USDA violated NEPA in promulgating the 2000 Rule by failing to inform and involve the public when it prepared the EA for the rule. *Id*. at 970; *see Citizens for Better Forestry v. U.S. Dept. of Agriculture*, 497 F.Supp.2d 1062, 1072 (N.D. Cal. 2006) (order adopting July 24, 2006 Report and Recommendation Re Plaintiffs' Motion for Attorneys' Fees and Costs) (holding that the Ninth Circuit's determination that USDA violated NEPA "was clear and certain and constituted a finding on the merits of the NEPA claim.").

While Citizens' suit challenging the 2000 Rule was pending, USDA announced that it intended to replace the 2000 Rule, and extended the transition period during which agency officials could choose to follow either the 1982 Rule or the 2000 Rule, until a new rule was promulgated. 66 Fed. Reg. 27,552, 27,554 (May 17, 2001) (one-year extension); 67 Fed. Reg. 35,431 (May 30, 2002) (extension until new rule became final); *see Citizens*, 341 F.3d at 968-69 (noting history).

In September, 2004, USDA issued an "interpretative rule," interpreting the transition provision of the 2000 Rule to mean that during the transition period, agency officials were required to only "consider" the best available science when amending or implementing existing forest plans, and that "the substantive provisions of the 2000 rule are not binding." 69 Fed. Reg. 58,055 (Sep. 29, 2004). According to the interpretative rule, however, agency officials could apply the 1982 Rule when amending or revising forest plans, "upon election of the responsible official." *Id*. at 58,056.

On January 5, 2005, USDA issued a rule to remove the 2000 Rule in its entirety, effective immediately. 70 Fed. Reg. 1022 (Jan 5, 2005). USDA noted "the lack of clarity regarding many of the [2000 Rule's] requirements." *Id*. USDA acknowledged that, given the choices agency officials had, "no

unit of the National Forest System has elected to use the 2000 planning rule for plan amendments or revisions." *Id*. Instead, all agency officials that were preparing plan amendments and revisions chose to do so pursuant to the 1982 Rule. *Id*.

On January 5, 2005, USDA also promulgated new, final NFMA regulations, and made them effective immediately. 70 Fed. Reg. 1023 (2005) ("2005 Rule") (codified at 36 C.F.R. pt. 219). USDA acknowledged that the 2005 Rule constituted "a paradigm shift in land management planning." 70 Fed. Reg. at 1024. In fact, the 2005 Rule eliminated nearly all mandatory management requirements in the 1982 Rule.[1] USDA, however, did not prepare an EIS or an EA under NEPA to consider and disclose the environmental effects of the 2005 Rule. Instead, USDA "categorically excluded" it from NEPA review. 70 Fed. Reg. at 1053-54. USDA also did not prepare a "biological assessment" of impacts of the 2005 Rule on threatened and endangered species, and did not consult with the United States Fish and Wildlife Service or National Marine Fisheries Service, as required by the ESA. *See* 70 Fed. Reg. at 1035.

Citizens and other conservation groups, another set of conservationists, and the State of California filed suit to challenge the 2005 Rule. On March 30, 2007, this Court held that USDA violated NEPA, the ESA, and the APA in promulgating the 2005 Rule. *Citizens for Better Forestry v. U.S. Dept. of Agriculture*, 481 F.Supp.2d 1059 (N.D. Cal. 2007). For injunctive relief, Citizens asked this Court to set aside the 2005 Rule and reinstate the 1982 Rule; USDA asked this Court to leave the 2005 Rule in place during a remand. *Id*. at 1098-99. This Court did not grant either request in its entirety. This Court

---

[1] For example, while the 1982 Rule complied with the NFMA duty to "provide for diversity of plant and animal communities" by requiring the Forest Service to "insure the viability of fish and wildlife species," 36 C.F.R. § 219.19 (1982), the 2005 Rule provided no meaningful guidance on species' viability or diversity. Instead, the 2005 Rule stated only an "overall goal" of providing ecological conditions to support diversity of plant and animal communities, required an undefined "framework" for providing those conditions, and then granted the responsible official complete discretion to determine whether any additional "provisions" may be crafted for specific species. 36 C.F.R. § 219.10(b).

enjoined USDA from implementing or utilizing the 2005 Rule, but as to which rule should govern future

agency action, this Court stated that "this is a determination for the USDA to make in the first instance."

*Id.* at 1100.  Further, "because the 2005 Rule may significantly affect the quality of the human

environment under NEPA, and because it may affect listed species and their habitat under the ESA," this

Court ordered USDA to "conduct further analysis and evaluation of the impact of the 2005 Rule in

accordance with those statutes." *Id.*[2]

On April 27, 2007, USDA decided to reinstate the 2000 Rule.  USDA issued direction that states

that "[t]he 2000 planning rule, including its transition provisions as clarified by the 2004 interpretative

rule, is now in effect."  Declaration of Regis Terney, Ex. A.  Before making this decision, USDA did not

provide any public notice or accept any public comment, and did nothing to cure its violation of NEPA

as determined by the Ninth Circuit.

Subsequently, USDA has implemented solely the transition provision of the 2000 Rule for site-

specific projects in national forests.  As a result, instead of demonstrating that each site-specific project

will comply with the substantive standards and protections of the 1982 Rule, even when they are

codified in the relevant forest plan, or all provisions of the 2000 Rule, the Forest Service merely states

that it has "considered" the best available science under one provision of the 2000 Rule.  For instance,

for the Bug Lake and Mt. Dutton logging projects on the Dixie National Forest, the Forest Service stated

as follows:

[2]  Subsequently, USDA filed a motion to amend or alter the judgment. *Citizens for Better Forestry v. U.S. Dept. of Agriculture*, 2007 WL 1970096 (N.D. Cal. July 3, 2007).  This Court denied the motion, reaffirming that the agency violated NEPA, the ESA, and the APA in developing the 2005 Rule, and clarifying that its injunction prohibiting USDA from implementing the 2005 Rule is national in scope. *Id.* *19 (ruling that because the 2005 Rule is a nationwide rule, a nationwide injunction is appropriate).

> On March 30, 2007, the United States District Court for the Northern District of California issued a decision enjoining the Forest Service from implementing the 2005 planning regulations. On April 27, 2007, Forest Service direction was issued to implement the 2000 planning regulations, including its transition provisions as clarified by the 2004 interpretative rule. . . The current regulations require that projects implementing land management plans and plan amendments, as appropriate, must be developed considering the best available science.

Declaration of Kevin Mueller, Ex. A at 1; Ex. B at 7; *see also* Declaration of Andy Stahl, Ex. A at 9

(Forest Service Dec. 6, 2007, response to administrative appeal, stating that the 1982 Rule is "no longer

in effect with regard to projects implementing Forest Plans." ).

On August 23, 2007, USDA issued a new "proposed rule" that is, as USDA admits, identical to

the 2005 Rule. 72 Fed. Reg. 48,514-15 (August 23, 2007) ("2007 Rule"). USDA also issued a draft

environmental impact statement ("EIS") that ostensibly evaluates the environmental effects of the 2007

Rule and alternatives to it. *Id.* The document is an EIS in name only, however, given that even though

the Ninth Circuit ruled that the revision of the NFMA regulations will result in actual, physical effects

on the environment, *Citizens*, 341 F.3d at 973, USDA maintains that its revision of a nationwide rule

governing all activities in national forests will result in no direct, indirect, or cumulative impacts to the

environment. Plaintiffs' Ex. A at 2 (August, 2007, Draft EIS, also available at:

http://www.fs.fed.us/emc/nfma/includes/2007_rule/2007_07_26_DEIS.pdf).

## STANDARD OF REVIEW

Citizens' claims under the APA and NEPA are subject to judicial review pursuant to the APA.

*Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998). The APA provides

that the court shall "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law," or found to be "without observance of procedure

required by law." 5 U.S.C. § 706(2)(A) & (D). For a violation of the APA, "vacatur of an unlawful

agency rule normally accompanies remand." *Alsea Valley v. Dep't of Commerce*, 358 F.3d 1181, 1185

(9th Cir. 2004). Similarly, for a violation of NEPA, "irreparable injury flows from the failure to evaluate

the environmental impact of a major federal action." *High Sierra Hikers v. Blackwell*, 390 F.3d 630,

642 (9th Cir. 2004). "[A]bsent unusual circumstances, an injunction is the appropriate remedy for a

violation of NEPA's procedural requirements." *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985).

**ARGUMENT**

**I.    USDA's Decision Constitutes Final Agency Action Pursuant to the APA.**

The APA provides that final agency action for which there is no adequate remedy in court is

subject to judicial review. 5 U.S.C. § 704; *Oregon Natural Desert Assoc. v. U.S. Forest Service*, 465

F.3d 977, 982 (9th Cir. 2006). The APA defines "agency action" to include "the whole or part of an

agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," 5 U.S.C.

§ 551(13), and defines "rule" as "the whole or a part of an agency statement of general or particular

applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id*. at §

551(4). The APA "broadly defines an agency rule to include nearly every statement an agency may

make," and the "breadth of this definition cannot be gainsaid." *Batterson v. Marshall*, 648 F.2d 694,

700 (D.C. Cir. 1980).

USDA's April 27, 2007, decision to reinstate the 2000 Rule constitutes agency action under the

APA. The decision was issued from the agency's national office in Washington, D.C., by the Deputy

Chief for the national forest system, and was directed to all Regional Foresters. Declaration of Regis

Terney, Ex. A. The decision prescribes the regulations that are in effect for site-specific projects and

forest plan revisions throughout the national forest system, and thereby constitutes a rule, and agency

action, under the APA. *Id*.; 5 U.S.C. §§ 551(4) & (13).

The decision also constitutes "final" agency action under the APA.  "For an agency action to be final, the action must (1) 'mark the consummation of the agency's decisionmaking process' and (2) 'be one by which rights or obligations have been determined, for from which legal consequences will flow.'" *Oregon Natural Desert Assoc.,* 465 F.3d at 982 (quoting *Bennett v. Spear,* 520 U.S. 154, 178 (1997)). "'The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.'" *Id*. (quoting *Indus. Customers of NW Utils. v. Bonneville Power Admin*., 408 F.3d 638, 646 (9th Cir. 2005)).  "The cases dealing with judicial review of administrative actions have interpreted the 'finality' element in a pragmatic way." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967).[3]

The decision represents the consummation of the Forest Service's decisionmaking process concerning the regulations it would "in the first instance" choose to adopt. *Cf. Citizens for Better Forestry*, 481 F.Supp.2d. at 1100.  The decision was issued less than a month after this Court enjoined USDA from implementing or utilizing the 2005 Rule; it was sent to all Regional Foresters; it states that the 2000 Rule "is now in effect"; and it prohibits individual national forests from implementing any activities specific to the 2005 Rule.  Declaration of Regis Terney, Ex. A.  As in *Abbott Labs*, there were no further administrative proceedings on the issue of what regulations apply.  387 U.S. at 149-50.

Moreover, the decision has directly affected Citizens and their members, as individual national forests have implemented the decision, as was intended, and applied the 2000 Rule to site-specific projects in national forests.  As stated in the May 25, 2007, Decision Notice for the Bug Lake logging

---

[3] *See also Her Majesty the Queen in Right of Ontario v. U.S. Envtl. Protection Agency*, 912 F.2d 1525, 1531 (D.C. Cir. 1990) (stating that an agency may not "avoid judicial review 'merely by choosing the form of a letter to express its definitive position on a general question of statutory interpretation.'") (*quoting Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 438 n.9 (D.C. Cir. 1986)).

project on the Dixie National Forest,

> On March 30, 2007, the United States District Court for the Northern District of California issued a decision enjoining the Forest Service from implementing the 2005 planning regulations. *On April 27, 2007, Forest Service direction was issued to implement the 2000 planning regulations, including its transition provisions as clarified by the 2004 interpretative rule.* To insure that this project would be in compliance with current regulations, the February 23, 2007, decision was withdrawn.

Declaration of Kevin Mueller, Ex. A at 1 (emphasis added); *see also id.*, Ex. B at 7 (Mt. Dutton project) (same). Because the Forest Service relied on the transition provision of the 2000 Rule, the agency merely "considered" the best available science instead of insuring compliance with the numerous mandatory standards and guidelines of the 1982 Rule, including the requirement to insure the viability of fish and wildlife on the forest. *Id.; see also* Declaration of Andy Stahl, Ex. A at 9 (response to administrative appeal regarding decision on Land Between the Lakes National Recreation Area, stating that the 1982 Rule is "no longer in effect with regard to projects implementing Forest Plans." ); Declaration of Josh Laughlin, Ex. A (October, 2007, decision notice for a project on the Willamette National Forest in Oregon, citing to the transition provision of the 2000 Rule).

Because the decision to reinstate the 2000 Rule marks the completion of the Forest Service's decisionmaking process regarding what NFMA regulations are now in effect, and because the agency's determination that the 2000 Rule is in effect, as opposed to the more protective 1982 Rule, has already affected and harmed Citizens' interests, the decision constitutes final agency action that is subject to judicial review under the APA. *Oregon Natural Desert Assoc.,* 465 F.3d at 982.

## II.    <u>USDA's Decision Violates the APA.</u>

The APA requires federal agencies to provide public notice and the opportunity to submit public comments before "formulating, amending or repealing a rule." 5 U.S.C. §§ 551(5) & 553; *Batterson v.*

*Marshall*, 648 F.2d at 700 (describing the APA's procedural requirements).  Agencies must also

generally comply with the APA notice and comment requirements before reinstating a rule.  *Mobile Oil*

*Corp. v. U.S. Environmental Protection Agency* ("EPA"), 35 F.3d 579, 584 (D.C. Cir. 1994).  Because

USDA failed to comply with the APA before reinstating the 2000 Rule, its decision should be declared

unlawful and set aside.  5 U.S.C. § 706(2); *National Wildlife Federation v. Clark*, 577 F. Supp. 825, 828

(D. D.C. 1984) (courts "have repeatedly set aside department and agency attempts to amend or rescind

outstanding regulations without strict adherence to a process of reasoning on the record with the benefit

of informed suggestions from those affected by the proposed rescission or amendment.").

On January 5, 2005, USDA removed the 2000 Rule in its entirety, effective immediately.  70

Fed. Reg. 1022 (Jan. 5, 2005).  As USDA stated, "in order to avoid any possible confusion within the

Forest Service, and the public regarding which revision of the planning regulations should be followed,

the Department has determined that removing the November 2000 planning regulations in their entirety

is necessary."  *Id*.  On April 27, 2007, however, USDA reinstated the 2000 Rule.  But USDA provided

no notice and comment prior to that decision, in violation of section 553 of the APA.

In *Mobil Oil v. EPA*, the petitioners challenged the EPA's reinstatement of a rule that a court had

vacated.  35 F.3d at 583-85.  The petitioners acknowledged that EPA had provided notice and comment

before promulgating the vacated rule, *id.* at 584, just as Citizens do not dispute that USDA provided an

opportunity for notice and comment on the 2000 Rule (but not the EA for the 2000 Rule) in 1999.

However, as in *Mobile Oil*, there have been intervening events that require a "fresh opportunity for

comment," *id*., including the fact that the Ninth Circuit held that USDA violated NEPA when it

promulgated the 2000 Rule.  "Accordingly, to repromulgate the rule, [USDA] must comply with the

applicable provisions of the APA."  *Id*.

Like the EPA in *Mobile Oil*, USDA may argue that the APA's good cause exception should apply in this case. 35 F.3d at 584 (citing 5 U.S.C. § 553(b)(3)(B)). As in *Mobile Oil*, however, such a finding and rationale had to be provided by USDA and supported in the record as "it is not self-evident." *Id*. Instead, "[n]ew information relevant to the agency's decisionmaking might well have come to light after the original notice and comment proceedings and before the repromulgation of the rule." *Id*. at 585. Because USDA "neither initiated a new rulemaking nor invoked the APA's good cause exception in the record," *id.,* the Court should find that USDA violated the APA in reinstating the 2000 Rule.

USDA's decision to reinstate the 2000 Rule without prior notice and an opportunity to provide comments is compounded by the fact that USDA is not even implementing all of the 2000 Rule, but merely the "transition provision" of the rule that simply requires the Forest Service to "consider" the best available science. In contrast, in 1999, when the public last had a chance to provide comments on the 2000 Rule, it certainly could not have foreseen that years later USDA would choose to ignore the majority of the rule, and instead solely and indefinitely implement the narrow "transition provision."

Moreover, USDA's decision to rely solely on the transition provision of the 2000 Rule for site-specific projects amplifies the NEPA violations already found by the Ninth Circuit regarding the 2000 Rule. When the Ninth Circuit determined that the implementation of the 2000 Rule would result in impacts to the environment, because it weakened the standards and protections of the 1982 Rule, the Ninth Circuit assumed USDA implement the 2000 Rule in its entirety - not solely the "transition provision."[4] USDA has never assessed the even larger environmental effect of replacing the 1982 Rule with a deferential, one sentence regulatory standard governing site-specific projects.

---

[4] *See Citizens*, 341 F.3d at 972-73 (recognizing that the 2000 Rule "decrease[d] substantive environmental requirements," and "pose[d] an actual, physical effect on the environment.").

Furthermore, NFMA mandates that the NFMA regulations include the standards and guidelines that are explicitly set forth in the statute. 16 U.S.C. § 1604(g). USDA's April 27, 2007, decision to reinstate solely the "transition provision" of the 2000 Rule means that there are no longer regulations in place for site-specific actions that even come close to complying with these required substantive standards. Because the numerous, substantive provisions of the 2000 Rule previously applied "not only to plan amendments and revisions, but also to project-level planning and decisionmaking," 67 Fed. Reg. 72,770, 72,771 (Dec. 6, 2002), the public again had no possibility to foresee that many years later USDA would suddenly reinstate only the transition provision of that rule.

Last, as indicated above, the April 27, 2007, decision to reinstate the 2000 Rule is at direct odds with USDA's decision in 2005 to formally remove the 2000 Rule in its entirety. 70 Fed. Reg. 1022. When an agency rule conflicts with a prior rule, the second rule is considered an amendment of the first rule, and is therefore considered "legislative," requiring public notice and comment pursuant to the APA. *D.H. Blattner & Sons, Inc. v. Secretary of Labor*, 153, F.3d 1102, 1109 (9th Cir. 1998) (quoting *National Family Planning & Reprod. Health Ass'n v. Sullivan*, 979 F.2d 227, 235 (D.C. Cir. 1992)).

The value of notice and comment is to ensure that an agency will not implement a rule without giving all parties an opportunity to first comment on the wisdom of the rule. *Consumer Energy Council v. Federal Energy Regulatory Comm'n*, 673 F.2d 425, 446 (D.C. Cir. 1982). Here, the public has had no opportunity to comment on the arbitrary agency decision to reinstate the 2000 Rule, including the decision to rely only the transition provision of the Rule, the complete failure to comply with NEPA, and the wholesale failure to comply with the minimum requirements of the NFMA. USDA's failure to allow for notice and comment before reinstating the 2000 Rule violates the APA. 5 U.S.C. § 553.

1

2

3    **III.    USDA's Decision Violates NEPA.**

4        NEPA requires federal agencies to consider the potential environmental impacts of their

5    decisions, and to involve the public in the process of considering those impacts.  USDA has not assessed

6    or considered the potential environmental impacts of its decision to reinstate the 2000 Rule, and has

7    failed to cure the procedural deficiencies regarding the 2000 Rule, in violation of NEPA.

8        **A.    Background on NEPA.**

9        "NEPA 'is our basic national charter for protection of the environment.'"  *Blue Mts.*, 161 F.3d at

10   1216 (quoting 40 C.F.R. § 1500.1(a)).  "NEPA was passed by Congress to protect the environment by

11   requiring that federal agencies carefully weigh environmental considerations and consider potential

12   alternatives to the proposed action before the government launches any major federal action."  *Lands*

13   *Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005).  The purpose of NEPA is to ensure "that the

14   agency, in reaching its decision, will have available, and will carefully consider, detailed information

15   concerning significant environmental impacts; it also guarantees that the relevant information will be

16   made available to the larger [public] audience that may also play a role in both the decisionmaking

17   process and implementation of that decision."  *Robertson v. Methow Valley Citizens Council*, 490 U.S.

18   332, 349 (1989).

19        NEPA requires federal agencies to prepare an EIS for any "major Federal action" that may

20   "significantly affect" the quality of the human environment.  42 U.S.C. § 4332(C).  The Ninth Circuit

21   has established a "relatively low threshold for preparation of an EIS."  *NRDC v. Duvall*, 777 F. Supp.

22   1533, 1537 (E.D. Cal. 1991).  An EIS *must* be prepared if substantial questions are raised as to whether a

23   federal action *may* cause a significant effect on some environmental factor.  *Idaho Sporting Congress v.*

24   *Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998) (emphasis original).  "Prior to preparing an EIS, the

25

26

27

28

agency may prepare an Environmental Assessment ("EA") as a preliminary step in determining whether

the environmental impact of the proposed action is significant enough to warrant an EIS." *Citizens for*

*Better Forestry*, 481 F.Supp.2d at 1080; *see* 40 C.F.R. §§ 1501.4(b) & 1508.9.  "An EA must be

prepared unless the agency decides to go ahead and prepare an EIS, *see* 40 C.F.R. § 1501.3(b), or unless

the actions comes within a categorical exclusion ('CE')."  *Id.* at 1080-81.

### B.    USDA's Decision Constitutes Federal Action under NEPA.

USDA's decision to reinstate the 2000 Rule not only constitutes final agency action under the

APA, it also constitutes "Federal action" under NEPA, triggering the need for at least an EA to

determine whether an EIS must be prepared.  Congress directed NEPA to apply "to the fullest extent

possible," which means as liberal an interpretation as possible to accommodate the application of NEPA.

*Jones v. Gordon*, 792 F.2d 821, 826 (9th Cir. 1986).  Thus the statutory phrase "actions significantly

affecting the quality of the environment" is "intentionally broad, reflecting the Act's attempt to promote

an across-the-board adjustment in federal agency decision making so as to make the quality of the

environment a concern of every federal agency."  *Scientists' Institute for Public Information v. Atomic*

*Energy Comm'n*, 481 F.2d 1079, 1088 (D.C. Cir. 1973).  "Federal actions" under NEPA therefore

includes not only the approval of site-specific projects, but also the adoption of official policy for an

agency, documents establishing agency policies which will substantially alter agency programs, and

documents prepared by federal agencies "which guide or prescribe alternatives uses of Federal resources,

upon which future agency actions will be based."  40 C.F.R. § 1508.18(b); *see also Scientists' Institute*

*for Public Information*, 481 F.2d at 1088 (recognizing that "actions" refers not only to the construction

of particular facilities, but also includes policy statements or the revision of ongoing programs).

USDA's decision will guide the development and implementation of thousands of future, site-specific agency actions.  In fact, USDA is already relying on the 2007 direction to guide projects on the national forest system.  For instance, while USDA had originally developed the Bug Lake and Mt. Dutton logging projects pursuant to a separate set of NFMA regulations, the decisions were withdrawn after USDA was enjoined from implementing the 2005 Rule.  Declaration of Kevin Mueller, Ex. A at 1 & Ex. B at 7.  USDA then explicitly looked to the April, 2007, direction and applied the 2000 Rule, claiming that it had "considered" the best available science for the project, as opposed to demonstrating compliance any specific regulatory requirements.  *Id*.  Similarly, because of its decision to reinstate the 2000 Rule, USDA has determined that the 1982 Rule is no longer in effect for site-specific projects and no longer considers the 1982 Rule in assessing those projects.  Declaration of Andy Stahl, Ex. A.

## C.    The Courts Have Already Determined that the 2000 Rule Violates NEPA.

The Ninth Circuit and this Court have already held that USDA violated NEPA when it promulgated the 2000 Rule.  In promulgating the 2000 Rule, USDA failed to allow any public comment on the EA.  *Citizens for Better Forestry*, 341 F.3d at 967.  The Ninth Circuit held that the "complete failure to involve or even inform the public" about the preparation of the EA violated NEPA.  *Id*. at 970.  Similarly, in assessing the plaintiffs' claims for attorneys' fees on remand in that case, this Court confirmed that the Ninth Circuit's decision was "clear and certain and constituted a finding on the merits of the NEPA claim."  *Citizens for Better Forestry*, 497 F.Supp.2d at 1072.  The Ninth Court's holding that USDA violated NEPA in promulgating the 2000 Rule is thus the "law of the Circuit."  *Id*. at 1073.

1

2

**D.    USDA Has Not Assessed the Environmental Effects of its Decision to Reinstate the 2000 Rule, And Has Not Cured the Legal Deficiencies with the 2000 Rule.**

3

4     There should be no dispute that USDA did not assess or disclose the potential environmental

5     impacts of reinstating the 2000 Rule before issuing the national direction to Regional Foresters in April,

6     2007.  There similarly should be no dispute that USDA did not cure the NEPA violations identified by

7     the Ninth Circuit in *Citizens for Better Forestry*, as USDA still has not allowed the public the

8     opportunity to submit comments or be involved concerning the EA that it prepared for the 2000 Rule.

9     Therefore, as it now stands, USDA is implementing the 2000 Rule for site-specific projects across the

10    national forest system even though it has never complied with NEPA.  The Court should hold that

11

12    USDA has thereby violated NEPA.

13    USDA may argue that it was not required to prepare an EA or EIS for the 2000 Rule, and

14    therefore its reinstatement of the Rule in 2007 does not violate NEPA.  But it has already made and lost

15    that argument.  As Magistrate Judge Chen stated in the findings adopted by this Court,

16

17          Defendants also contend that the Ninth Circuit's finding is not dispositive because the
          court did not address the threshold issue of whether the USDA was required to prepare an

18          EA for the 2000 Final Rule in the first place.  However, the Ninth Circuit implicitly and
          necessarily rejected the argument in finding the NEPA violation.  If an EA were in fact

19          not required at all, there would be no violation based on the lack of opportunity to
          comment on the EA.

20

21    *Citizens for Better Forestry*, 497 F.Supp.2d at 1073.  Further, the Ninth Circuit specifically determined

22    that implementing the 2000 Rule would in fact result in at least indirect impacts to the environment:

23          Citizens correctly assert that the 2000 Plan Development Rule decreases substantive
          environmental requirements. . .  Its environmental impact is indirect: because the Rule

24          controls the development of [forest plans] and site-specific plans, it is through these that
          it poses an actual, physical effect on the environment in national forests and grasslands.

25

26    *Citizens for Better Forestry*, 341 F.3d at 972-73.

27

28

USDA may also argue that had Citizens sought to prohibit USDA from implementing the 2000

Rule, Citizens could have moved for injunctive relief in the previous challenge to the 2000 Rule.  But

this case includes plaintiffs that were not parties to the case challenging the 2000 Rule.[5]  Moreover, the

plaintiffs in the previous case had no reason to seek to enjoin the 2000 Rule, because USDA was not

implementing the rule, and had already issued a new, proposed rule (67 Fed. Reg. 72,770) by the time

the Ninth Circuit issued its decision regarding the agency's failure to comply with the NEPA for the

2000 Rule.  Indeed, had the plaintiffs in the previous case sought to enjoin the 2000 Rule, USDA would

have undoubtedly argued that they could not establish the requisite harm necessary to obtain such relief,

because USDA was not implementing the rule.  The plaintiffs in that case were certainly not required to

foresee that USDA would again promulgate another set of NFMA regulations in violation of federal law,

and then reinstate the 2000 Rule once this Court set aside those regulations.

**E.    USDA Failed to Provide a Convincing Statement of Reasons That No NEPA Analysis Was Required Before it Reinstated the 2000 Rule.**

An agency's decision not to prepare an EIS is unreasonable if the agency fails to supply a

"convincing statement of reasons" why potential effects are insignificant, and the court may defer to an

agency's decision not to prepare an EIS only when it is "well informed and well considered."  *Save the*

*Yaak Committee v. Block*, 840 F.2d 714, 717 (9th Cir. 1988).  Similarly, "[w]hen an agency decides to

proceed with an action in the absence of an EA or EIS, the agency must adequately explain its decision."

*Citizens for Better Forestry*, 481  F.Supp.2d at 1082 (*quoting Alaska Ctr. For the Env't v. U.S. Forest*

*Service*, 189 F.3d 851, 859 (9th Cir. 1999)).  "It is important that the agency be able to point to 'a record

---

[5] The Center for Biological Diversity, Environmental Protection Information Center, and Forest Service Employees for Environmental Ethics are each plaintiffs in this case, but were not plaintiffs in the case challenging the initial development and promulgation of the 2000 Rule.

1   of decision invoking a categorical exclusion.'" *Id.* (*quoting California v. Norton*, 311 F.3d 1162, 1176

2   (9th Cir. 2002)).

3
4       USDA has submitted no reasons at all why an environmental analysis was not required under

5   NEPA before it reinstated the 2000 Rule.  The only factual document USDA has presented to the Court

6   is its decision itself.  But the decision does not mention or discuss any NEPA analysis, or a categorical

7   exclusion.  USDA's complete failure to provide any sort of statement of reasons or rationale as to why

8   its decision will not result in any direct or indirect impacts to the environment renders its failure to

9
    prepare an EA or EIS as arbitrary, capricious, and in violation of NEPA.  *Alaska Center for the Envt.*,
10
    189 F.3d at 859 (stating that when an agency proceeds with an action without an EA or EIS, it must
11
12  adequately explain its decision).

13  **IV.   The Court Should Enjoin the Forest Service From Further Implementing the 2000 Rule**
14        **Prior to Curing the Procedural Deficiencies and Allowing Public Notice and Comment.**

15      To remedy USDA's violations of the APA and NEPA, Citizens respectfully request that the

16  Court set aside USDA's decision to reinstate the 2000 Rule and prohibit USDA from any further

17  implementation of the 2000 Rule until the Court determines that it has complied with the law.  Because

18
    USDA reinstated the 2000 without complying with the required APA procedures, its decision shall be
19
    set aside.  5 U.S.C. § 706(2).  Similarly, for Citizens' NEPA claim, an injunction setting aside the 2000
20
21  Rule is the appropriate remedy "absent unusual circumstances."  *Thomas v. Peterson*, 753 F.2d at 764.

22  As noted, USDA bears the burden to establish the existence of unusual circumstances, and none are

23
    present here.  *Id.; Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1496 (9th Cir. 1995).
24
25      Even though merely prospective harm is enough to obtain an injunction, *National Parks*

26  *Conservation Assn. v. Babbitt*, 241 F.3d 722, 737 (9th Cir. 2001), USDA's decision is already actually

27
28

harming Citizens, because the agency is no longer implementing the more protective 1982 Rule in site-specific projects. *See e.g.*, Declaration of Kevin Mueller, ¶ 10; Declaration of Andy Stahl, ¶ 6; Declaration of Josh Laughlin, ¶ 7. In addition, because USDA failed to comply with NEPA for the 2000 Rule, and has never assessed the environmental impacts of implementing solely the "transition provision" of the 2000 Rule across the national forest system, Citizens are suffering procedural harm that requires injunctive relief. *National Parks*, 241 F.3d at 738 n18; *see* Declaration of Kevin Mueller, ¶ 11; Declaration of Andy Stahl, ¶ 7; Declaration of Josh Laughlin, ¶ 8.

Finally, because NFMA requires a comprehensive regulatory framework in place to govern the national forest system, *see* 16 U.S.C. § 1604(g), as opposed to the simple transition provision of a procedurally defective rule, the Court should reinstate the 1982 Rule. USDA has over twenty years of experience in fully implementing the 1982 Rule for national forest planning and site-specific projects, and it is the only set of NFMA regulations that have never been found to be legally defective or difficult to implement. In fact, USDA admits that for the past two decades, the 1982 Rule is the only set of planning regulations it has applied in any national forest planning effort. *See* 70 Fed. Reg. at 1022.

## CONCLUSION

Citizens respectfully request that the Court to grant Plaintiffs' motion for summary judgment and injunctive relief.

Dated: January 25, 2008.          Respectfully submitted,


/s/ Peter M.K. Frost
Peter M.K. Frost, *pro hac vice*
Marc D. Fink, *pro hac vice*
Lisa T. Belenky (CA Bar No. 203225)

Attorneys for Plaintiffs

1
2
3
4
5

Peter M.K. Frost, *pro hac vice*
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
Tel: 541-485-2471
Fax: 541-485-2457
frost@westernlaw.org

6
7
8
9
10

Marc D. Fink, *pro hac vice*
Center for Biological Diversity
4515 Robinson Street
Duluth, Minnesota 55804
Tel: 218-525-3884
Fax: 218-525-3857
mfink@biologicaldiversity.org

11
12
13
14
15

Lisa T. Belenky (CA Bar No. 203225)
Center for Biological Diversity
1095 Market St., Suite 511
San Francisco, California 94103
Tel: 415-436-9682 x 307
Fax: 415-436-9683
lbelenky@biologicaldiversity.org

16

Attorneys for Plaintiffs

17
18
19

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

20
21
22
23
24
25
26
27
28

CITIZENS FOR BETTER FORESTRY, et al.     )     Case No: 3:07-cv-3831-MJJ
                                          )
            Plaintiffs,                   )     **PLAINTIFFS' EXHIBIT LIST**
                                          )
                v.                        )
                                          )
UNITED STATES DEPARTMENT OF               )
AGRICULTURE, et al.                       )
                                          )
            Defendants.                   )
_____  )

1

**INDEX TO PLAINTIFFS' EXHIBIT**

2

Exhibit A:    August, 2007, Draft Environmental Impact Statement, National Forest System Land
3            Management Planning; also available at:
             http://www.fs.fed.us/emc/nfma/includes/2007_rule/2007_07_26_DEIS.pdf
4

5        Dated: January 25, 2008.            Respectfully submitted,
6

7                                            /s/ Peter M.K. Frost_____
8                                            Of Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



United States
Department of
Agriculture

Forest
Service

August 2007



# Draft Environmental Impact Statement

## National Forest System Land Management Planning

**United States Department of Agriculture, Forest Service**

# National Forest System Land Management Planning
## Draft
## Environmental Impact Statement

**Lead Agency:**                              **USDA Forest Service**

**Responsible Official:**                     **Mark Rey, Undersecretary, Natural Resources and Environment, USDA**

**For Information Contact:**                  **Dave Sire, Ecosystem Management Coordination dsire@fs.fed.us (202) 205-1006**

                                              **Regis Terney, Ecosystem Management Coordination rterney@fs.fed.us (202) 205-1552**

**Abstract:** The Agency proposes to publish a rule at 36 CFR part 219 to finish rulemaking on the land management planning rule issued on January 5, 2005 (2005 rule). The 2005 rule guides development, revision, and amendment of land management plans for units of the National Forest System. The Agency is considering five alternatives in detail, including the proposed action. The proposed action and preferred alternative is the planning rule published on January 5, 2005 and amended on March 3, 2006 (Alternative A). Other alternatives are: the 2000 rule as it existed before promulgation of the 2005 rule (Alternative B); the 1982 rule as it existed before promulgation of the 2000 rule (Alternative C); a modified version of the 2005 rule, which does not include the requirements for an environmental management system (EMS) (Alternative D); and a modified version of the 2005 rule, which does not include the requirements for an EMS and includes timber requirements placed in Agency directives under the 2005 rule (Alternative E). The effects analysis concludes that there are no direct, indirect, or cumulative effects from any of the alternatives. The draft environmental impact statement is available online at http://www.fs.fed.us/emc/nfma/2007_planning_rule.html. The final environmental impact statement, when completed, will be available on the same website.

Reviewers should provide the Forest Service with their comments during the review period of the draft environmental impact statement. Doing so will enable the Agency to analyze and respond to the comments at one time and to use information acquired in the preparation of the final environmental impact statement, thus avoiding undue delay in the decisionmaking process. Reviewers have an obligation to structure their participation in the National Environmental Policy Act process so that it is meaningful and alerts the Agency to their position and concerns. Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 553 (1978). Environmental objections that could have been raised at the draft stage may be waived if not raised until after completion of the final environmental impact statement. City of Angoon v. Hodel (9th Circuit, l986) and Wisconsin Heritages, Inc. v. Harris, 490 F. Supp. 1334, 1338 (E.D. Wis. 1980). Comments on the draft environmental impact statement should be specific and should address the adequacy of the statement and the merits of the alternatives discussed (40 CFR 1503.3).

**Send Comments to:**                         **planningrule@fscomments.org or to Planning Rule Comments P.O. Box 162969 Sacramento, CA 95816–2969 or via facsimile to (916) 456–6724**

**Date By Which Comments Must Be Received:**  **October 22, 2007**

# SUMMARY

The Agency is seeking public comment on a proposed land management planning rule at 36 CFR part 219 to finish rulemaking on the National Forest System land management planning rule issued on January 5, 2005 (2005 rule) and amended on March 3, 2006. The proposed planning rule and alternative planning rules would establish administrative procedures whereby National Forest System land management plans are developed, revised, and amended.

This action is needed because the Forest and Rangeland Renewable Resources Planning Act of 1974 (88 Stat. 476 *et seq.*), as amended by the National Forest Management Act of 1976 (NFMA) (90 Stat. 2949 *et seq.*; 16 U.S.C. 1601–1614), requires the Secretary to promulgate regulations under the principles of the Multiple-Use Sustained-Yield Act of 1960, which established the process for the development and revision of land and resource management plans (16 U.S.C. 1604(g)).

The 2005 rule at 36 CFR part 219 (70 FR 1022) resulted from a review of the National Forest System Land Management Planning Rule issued on November 9, 2000 (2000 rule). The review found (1) the 2000 rule has definitions and analytical requirements that are complex, unclear, and, therefore, subject to inconsistent implementation across the Agency; (2) compliance with the regulatory direction in the 2000 rule regarding ecological sustainability and science consistency checks would be difficult to accomplish; and (3) the complexity of the 2000 rule makes it difficult and expensive to conduct.

This proposal to publish a land management planning rule improves on the 2000 rule with a planning process that is easier to understand, is in the Agency's capability to accomplish, is consistent with the capabilities of National Forest System lands, and recognizes the strategically programmatic nature of planning.

This rulemaking is the result of a U.S. district court order dated March 30, 2007, which enjoined the United States Department of Agriculture from implementing and utilizing the 2005 planning rule (70 FR1022) until it complies with the court's order regarding compliance with the National Environmental Policy Act, the Endangered Species Act, and the Administrative Procedure Act (APA) (*Citizens for Better Forestry et al. v. USDA,* C.A. C05-1144 (N. D. Cal.)).

The Agency published a Notice of Intent in the Federal Register on May 11, 2007 (72 FR 26775), to start the public involvement process. Also, the Agency sent a letter on May 14, 2007, to more than 500 stakeholders giving notice of its intent to prepare an environmental impact statement to analyze and disclose potential environmental consequences associated with a National Forest System land management planning rule.

The Forest Service reviewed documents filed in *Citizens for Better Forestry et al. v. USDA* (N.D. Calif.), comments in response to the notice of intent, comments previously collected during promulgation of the 2005 rule (70 FR 1022), Agency planning directives (72 FR 4478, 71 FR 10956, 71 FR 5124), and the Agency categorical exclusion for land management planning (71 FR 75481). An interdisciplinary team developed a list of issues for discussion:

*Diversity of Plant and Animal Communities*

Some respondents are concerned the 2005 rule procedures for diversity weaken protection for fish and wildlife species because the 2005 rule does not include the requirements for managing habitat to maintain viable populations, the requirement to select management indicator species (MIS), and the requirement to either establish habitat objectives for MIS or monitor population trends of MIS.

*Timber Management Requirements of 16 U.S.C. 1604(g)*

Some respondents are concerned the 2005 rule guidance for timber resource management (36 CFR 219.12(b)(2)) is inadequate because it does not include the level of specificity of the 1982 rule. Further, some respondents contend the timber management requirements from NFMA are legally required to be in the regulations. Although the 2005 rule states that these requirements will be found in internal Forest Service directives, courts have frequently found that internal Agency directives are not judicially enforceable.

*Identification of lands not suited for timber production (16 U.S.C. 1604(k))*

Some respondents are concerned the 2005 rule guidance for identification of lands not suited for timber production (36 CFR 219.12(a)(2) (2005)) is insufficient because it does not include the level of detail that was included in earlier rules. They are concerned this level of detail represents an elimination of resource protection standards.

*Standards and Prohibitions*

Some respondents are concerned that the 2005 rule limits land management plans to strategic plan components rather than being a conventional plan. A conventional plan would include plan components that prohibit uses or activities in management areas or prohibit activities near specific ecological features, such as within 100 feet of streams. Some respondents are concerned with guidelines because the 2005 planning rule allows the responsible official discretion (36 CFR 219.12(b)(2)).

*Environmental Impact Statement*

There is concern that by not requiring an environmental impact statement for plan revisions, the proposed action (2005 rule) does not require consideration of a full range of planning alternatives, reduces public involvement in land management planning, and leaves consideration of cumulative effects to project-level analyses.

*Best Available Science and Land Management Plans*

Some respondents are concerned because the 2005 rule requires the responsible official to take into account the best available science, while the 2000 rule requires the responsible official to ensure the plan is consistent with the best available science (36 CFR 219.24 (2005)).

*Management requirements*

Some respondents are concerned the proposed planning rule does not include minimum specific management requirements as the 1982 rule did at §219.27(1982). They contend that the lack of management requirements in the planning rule will reduce environmental protections and result in significant environmental impacts. They further contend that lower environmental requirements in a planning rule will likely result in less environmental protection at the unit and site-specific levels.

These issues led the Agency to develop alternatives to the proposed action. The Forest Service developed five alternatives for detailed study, including the No Action and Proposed Action alternatives, in response to the significant issues.

*Alternative A (Proposed Action)*

The 2005 rule, as originally published on January 5, 2005, and amended on March 3, 2006, and with updated effective date and transition period date at §219.14 is the proposed action and preferred alternative. This rule is Appendix A of this environmental impact statement.

The proposed rule describes the National Forest System land management planning framework; establishes requirements for sustaining social, economic, and ecological systems and developing, amending, revising, and monitoring land management plans; and clarifies that land management plans under this rule, absent extraordinary circumstances, are strategic and are one stage in an adaptive management cycle of planning for management of National Forest System lands. The intended effects of the rule are to streamline and improve the planning process by increasing the adaptability to changes in social, economic, and environmental conditions; by strengthening the role of science in planning; by strengthening collaborative relationships with the public and other governmental entities; and to reaffirm the principle of sustainable management consistent with the Multiple-Use Sustained-Yield Act and other authorities.

*Alternative B (No Action)*

Under the No Action alternative, the 2000 rule at 36 CFR part 219, as it existed before promulgation of the 2005 rule, would guide development, revision, and amendment of land management plans for the National Forest System. This rule describes the framework for National Forest System land and natural resource planning; reaffirms sustainability as the goal for National Forest System planning and management; sets up requirements for the implementation, monitoring, evaluation, amendment, and revision of land and resource management plans; and guides the selection and implementation of site-specific actions. The intended effects of the rule are to simplify, clarify, and otherwise improve the planning process; to reduce burdensome and costly procedural requirements; to strengthen and clarify the role of science in planning; and to strengthen collaborative relationships with the public and other government entities. The 2000 rule, as amended, is Appendix B of this environmental impact statement.

*Alternative C (1982 planning rule)*

Under this alternative, the 1982 rule at 36 CFR part 219, as it existed before promulgation of the 2000 rule, would guide development, revision, and amendment of land management plans for the National Forest System.

This rule requires integration of planning for national forests and grasslands, including the planning for timber, range, fish and wildlife, water, wilderness, and recreation resources, with resource protection activities such as fire management, and the use of other resources such as minerals. The 1982 rule, as amended, is Appendix C of this environmental impact statement.

*Alternative D (Proposed Action Modified)*

This alternative is the same as the proposed action (Alternative A) but without either environmental management system (EMS) requirements or references to EMS. The EMS section at §219.5 in the proposed action is not in this alternative. EMS would not be part of the plan set of documents. EMS establishment would not be required before plan approval and it would not mark the end of the transition period.

*Alternative E (Proposed Action Modified)*

This alternative is the same as the proposed action (Alternative A) as modified by: 1) removing environmental management systems (EMS) requirements and various references to EMS, 2) adding standards as a plan component, 3) adding more direction about identifying lands suitable for timber production and timber harvest, and 4) adding various timber management requirements from the National Forest Management Act (NFMA). This direction for various timber management requirements is currently specified in Forest Service directives (FSM 1921.12, FSH 1909.12, chapter 40).

This alternative maintains the provision at §219.4, which defers to Agency NEPA procedures for the environmental analysis level and documentation needed. Under this alternative, the NEPA analysis level and documentation would be based on how a unit applies the six plan components. It would be possible for one unit to approve a plan with a categorical exclusion, a second unit to use an environmental assessment, and a third unit might use an environmental impact statement.

Four additional alternatives were considered and eliminated from detailed study because they did not meet the purpose and need for action.

Major conclusions of the environmental analysis are as follows:

In the end, regardless of the planning rule used, land management plans for each unit of the National Forest System show social and economic values placed on National Forest System lands and environmental laws, regulations, and requirements for protection of the environment. The proposed planning rule and alternative planning rules merely set forth processes to recognize and document these values and environmental protections.

The proposed planning rule and alternative planning rules have no direct, indirect, or cumulative effect on the human environment. None of the alternatives would result in unavoidable adverse effects or any diminution of productivity of NFS lands. Finally, these rules do not call for any irreversible or irretrievable commitments of resources.

The draft environmental impact statement for the proposed planning rule is available online at http://www.fs.fed.us/emc/nfma/2007_planning_rule.html. The final environmental impact statement, when completed, will be available on the same website.

Peter M.K. Frost, *pro hac vice*
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
Tel: 541-485-2471
Fax: 541-485-2457
frost@westernlaw.org

Marc D. Fink, *pro hac vice*
Center for Biological Diversity
4515 Robinson Street
Duluth, Minnesota 55804
Tel: 218-525-3884
Fax: 218-525-3857
mfink@biologicaldiversity.org

Lisa T. Belenky (CA Bar No. 203225)
Center for Biological Diversity
1095 Market St., Suite 511
San Francisco, California 94103
Tel: 415-436-9682 x 307
Fax: 415-436-9683
lbelenky@biologicaldiversity.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| CITIZENS FOR BETTER FORESTRY, et al. | ) | Case No: 3:07-cv-3831-MJJ |
| | ) | |
| Plaintiffs, | ) | **DECLARATION OF** |
| | ) | **JOSH LAUGHLIN** |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| AGRICULTURE, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

DECLARATION OF JOSH LAUGHLIN

I, Josh Laughlin, declare:

1. I am the Conservation Director of the Cascadia Wildlands Project, and reside in Eugene, Oregon.

2. The Cascadia Wildlands Project works to protect the ecological integrity of the Cascadia Bioregion, which includes much of Alaska, Washington, and Oregon. Members of the Cascadia Wildlands Project use and enjoy the national forests within the Cascadia Bioregion, including the Willamatte National Forest, for a variety of uses, including hiking, fishing, camping, photographing scenery and wildlife, and for engaging in other vocational, scientific, and recreational activities. Our members derive recreational, inspirational, religious, scientific, educational and aesthetic benefit from their activities within these national forests, and intend to continue to use and enjoy these national forests frequently and on an ongoing basis in the future, including this winter and next spring and summer.

3. The Cascadia Wildlands Project has been extensively involved in the Forest Service's attempts to revise the National Forest Management Act ("NFMA") regulations. When the Forest Service proposed revisions to the NFMA regulations in 2000, we did not receive any notice concerning the agency's preparation of an environmental assessment for the revised regulations. We only became aware that an environmental assessment had been prepared for the regulations after viewing the assessment and related "decision notice" and "finding of no significant impact" on the Forest Service website after the public comment period for the proposed regulations had already expired.

4. The Cascadia Wildlands Project joined as a plaintiff in a lawsuit challenging the 2000 NFMA regulations. After the Ninth Circuit agreed that the Forest Service violated the

DECLARATION OF JOSH LAUGHLIN

National Environmental Policy Act in developing these regulations, and the Forest Service subsequently withdrew the regulations in the federal register, we assumed the 2000 regulations would not be implemented.

5.     The Cascadia Wildlands Project also joined as a plaintiff in a lawsuit challenging the 2005 NFMA regulations. In April, 2007, after the Forest Service was enjoined from implementing the 2005 NFMA regulations, we learned that the Forest Service had issued nationwide direction to all of its Regional Foresters to again implement the 2000 NFMA regulations.  We were not provided any advance notice or an opportunity to provide comments prior to the agency's reinstatement of the 2000 NFMA regulations.

6.     In October, 2007, we received the Decision Notice for the Presley's Twin project on the Willamette National Forest in Oregon, which acknowledges that the Forest Service is implementing the "transition provision" of the 2000 NFMA regulations for this project.  Exhibit A at 12.  As a result, the Forest Service is merely "considering" the best available science, as opposed to insuring compliance with the numerous, mandatory provisions of the 1982 NFMA regulations.  *Id.*

7.     If the Presley's Twin project had been developed under the 1982 NFMA regulations, as opposed to solely the transition provision of the 2000 regulations, the Forest Service would have been required to insure additional protection for fish, wildlife, and other resources.  *See e.g.*, 36 C.F.R. § 219.19 (1982).  The interests of the Cascadia Wildlands Project and its members will likely be harmed by the Forest Service's failure to insure the viability of wildlife species and compliance with the many additional provisions of the 1982 regulations prior to implementing this project.

DECLARATION OF JOSH LAUGHLIN

8.      In addition, the Forest Service has not prepared any environmental analysis pursuant to the National Environmental Policy Act concerning its decision to implement solely the transition provision of the 2000 NFMA regulations for projects across the National Forest System.  The Cascadia Wildlands Project is further harmed by not being able to be involved in such an environmental analysis, as required by the National Environmental Policy Act, and by not knowing the potential impacts of such a dramatic decrease in regulatory protection for our national forests.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 23rd day of January, 2008, in Eugene, Oregon

/s/ Josh Laughlin
Josh Laughlin

(The filer hereby attests that Mr. Laughlin concurred with the filing of this declaration, and his written concurrence is in my possession).

DECLARATION OF JOSH LAUGHLIN



United States
Department of
Agriculture

**Forest
Service**

Pacific
Northwest
Region

October 2007



# Decision Notice and Finding of No Significant Impact

## Presley's Twin Project

Detroit Ranger District, Willamette National Forest,

Linn County, Oregon

Legal Location:  T12S R7E; T11S R7E W.M.


Responsible Official:

Paul Matter, District Ranger

Detroit Ranger District,

Willamette National Forest

HC 73, Box 320

Mill City, OR 97360


For Further Information:

Christy McDevitt, IDT leader

HC 73, Box 320

Mill City, OR 97360

(503) 854-4219

cmcdevitt@fs.fed.us

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and where applicable, sex, marital status, familial status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or part of an individual's income is derived from any public assistance program. (Not all prohibited bases apply to all programs.) Persons with disabilities who require Alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD). To file a complaint of discrimination, write to USDA, Director, Office of Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410, or call (800) 795-3272 (voice) or (202) 720-6382 (TDD). USDA is an equal opportunity provider and employer.

DECISION ................................................................................................................................2

MITIGATION MEASURES ....................................................................................................4

DECISION RATIONALE ........................................................................................................5

   Rational for selecting Alternative 2 .................................................................................5
   Other Alternatives Considered .........................................................................................6

PUBLIC AND GOVERNMENT INVOLVEMENT ...............................................................8

   Comment Summary .............................................................................................................8

FINDING OF NO SIGNIFICANT IMPACT ..........................................................................8

   Context ..................................................................................................................................8
   Intensity ................................................................................................................................9

FINDINGS REQUIRED BY OTHER LAWS AND REGULATIONS..................................11

ADMINISTRATIVE REVIEW OR APPEAL OPPORTUNITIES .......................................12

   Appeals may be .................................................................................................................12
   Contact Person ..................................................................................................................13
   Implementation Date .........................................................................................................13

   APPENDIX A – RESPONSE TO COMMENTS ..............................................................14

# Decision

The Presley's Twin Environmental Assessment documents the environmental effects associated with a proposal to harvest timber on 1668 acres of the Presley's Twin project area which will yield about 19 million board feet (19 MMBF) of wood products. The purpose of this initiative is to improve growth of the stands and promote forest health, maintain an environmentally sound road network, and to provide a sustainable supply of wood products.

I have decided to select Alternative 2 to implement timber harvest (including thinning, shelterwood, and regeneration harvest) on about 1668 acres within the Presley's Twin project area.

This Alternative will:

- Harvest roughly 19MMF on 1668 acres
- Plant 55 acres of regeneration and shelterwood creation units
- Reopen 3.5 miles of temporary spur roads
- Construct 0.6 miles of new temporary spur roads (roads will be closed after use)
- Maintain and reconstruct 28.76 miles of existing system roads
- Grapple pile and burn 412 acres
- Burn piles at landings
- Broadcast burn 38 acres
- Underburn 41 acres

This decision is based on my review of the analysis presented in the Presley's Twin Environmental Assessment and the comments received from the public during the 30-day comment period.

Alternative 2 will harvest densely stocked, fire-regenerated and previously managed stands on 1668 acres. The Alternative includes 834 acres of final shelterwood overstory removal on shelterwood stands, 52 acres of shelterwood creation, 3 acres of regeneration harvests with reserves, 633 acres of thinning 100-190 year old stands to a canopy closure of about 50%, and 146 acre of post and pole thinning.

Total volume of commercial timber harvested is expected to be 19 million board feet (MMBF).

The timber sales from this proposal are likely to operate over a five-year period, beginning in 2008.

Harvest systems will include 1642 acres of ground based systems and 26 acres of skyline.

This action includes the construction of .6 miles of temporary spur road and the reopening of 3.5 miles of temporary spur roads. Upon completion of sale activities, the new temporary roads will be decommissioned by scarification, seeding, and maintenance of natural drainage patterns.

Alternative 2 will pave about 1.5 miles of the 2261 road to the end of the road.

Alternative 2 prescribes road maintenance and reconstruction activities on 28.76 miles of existing forest roads needed for timber haul. Road maintenance activities will include cutting hardwood trees along roads, felling hazard trees for the life of the road, clearing and grubbing, surface blading, replacing drainage structures, reshaping ditches, and placement of aggregate surfacing. Reconstruction activities will include sections of asphalt patching, subgrade repair,

culvert replacement, erosion repair, new culvert installation, brushing, slump repair, clearing and grubbing, road widening, and crushed rock placement.

Fuel treatments that will occur as part of the proposed action for Presley's Twin sale include 493 acres of the following: grapple piling and burning, broadcast burning and under burning. Prescribed burning for fuel treatment will take place when weather and fuels resemble spring-like conditions which include:  fuels greater than three inches in diameter, fuel moistures equal to or greater than 25%, ensuring soil and duff retention levels are maintained at or below duff retention objectives.

Portions of riparian reserves subjected to thinning will benefit from increased diversity and improved stand health.  All thinning in riparian reserves is intended to accelerate development of large trees adjacent to streams, provide future large wood input to stream channels.  Activities in the riparian reserves will not reduce existing stream shading vegetation or levels of large wood in streams associated with regeneration harvest units.  Full riparian reserve areas will function as no-harvest buffers in regeneration units.  Carter Lake tightcoil will be protected with a 33 foot no-disturbance buffer on perennially wet streams.

Alternative 2 will include leaving live green trees, of suitable sizes, within the proposed final shelterwood removal harvest units for future snag and down wood creation.  The treatment will occur 4 to 5 years after harvest.  In the proposed regeneration units, mortality of some of the remaining trees is expected to occur following broadcast burning.  Follow-up snag and down wood creation will occur to meet prescribed post harvest levels for snags and down wood.

Slash, slash piles and landing debris created through operations along mainline roads and dispersed sites will be cleaned up to improve visual quality along roads that are used for recreation traffic if funding is available.

Post-sale activities include:

- tree planting;
- wildlife tree and coarse woody debris creation;
- noxious weed survey and treatment;
- fuel treatment
- monitoring (including noxious weeds, heritage, , and wildlife trees);
- precommercial thinning;
- gate replacement;
- erosion control seeding, slope stabilization and restoration; and
- fertilization

A complete list of post-sale activities can be found in Appendix D of the EA.

# Mitigation Measures

The significant issue of connectivity and biodiversity was addressed by establishing a no-harvest corridor as part of the mitigations for the preferred alternative.

Stands were selected for inclusion in the corridor because they provide botanical, hydrological and wildlife resources lacking in many project units. Stands in the corridor have high amounts of understory huckleberry plants, scattered mesic sites – which have a moderate well-balanced supply of moisture – and hydric soils – which often develop anaerobic conditions in the upper levels of soil due to high amounts of water.  These mesic and hydric sites support unique plant communities with high species richness and include meadows and riparian areas. The proposed corridor has the fewest number of skid roads from previous harvest activities. Soils here are not as disturbed and compacted as nearby areas and they support more surface water features.

Benefits of the corridor include:

- Decreased noise levels due to higher density vegetation (*EA page 16*),

- less human traffic during operations (*EA page 16*),

- opportunities for undisturbed movement by wildlife (*EA page 16*),

- corridor stands provide dispersal habitat for northern spotted owls (*EA page 23*),

- improved hiding cover due to undisturbed hiding and travel pathways (*EA page 87*),

- connects north –south dispersal habitat for northern spotted owls (*EA page 107*),

- enhancement of botanic diversity (*EA page 109*),

- dispersal and genetic exchange that contributes to species viability is encouraged (*EA page 109*),

- biodiversity of plant species through out the project area will be preserved (*EA page 109*),

- development of diverse species composition (*EA page 109*),

- barrier to invasive weed spread by reducing the amount of potential weed habitat. (*EA page 121*),

- connected pockets of hydric/mesic vegetation with riparian corridors and special habitats (*EA page 121*).

In addition to the no-harvest corridor several other mitigation measures will be implemented as part of the proposed alternative.  These include replanting the one regeneration unit, snag and downed woody debris creation, limiting snow plowing to protect wintering big game, weed recruitment monitoring, subsoiling to reduce compaction, clean up of slash piles and debris, haul restrictions to ensure safety of travelers on the 2261 road, limits on operations during opening weekends of certain hunting seasons, and mandatory signage to inform public of paving operations and logging traffic.  A full description of mitigation measures and those units where they apply can be found in the EA (*EA pages 37-40*).

# Decision Rationale

## Rational for selecting Alternative 2

I have reviewed the environmental effects which will result from implementation and weighed the issues that underlie each Alternative. A discussion of other alternatives including alternatives considered but eliminated from detailed study can be found in the EA (*EA pages 18-45*). Based on the information provided in the EA, including its analysis of the environmental consequences of the various Alternatives, mitigations, and design criteria to minimize anticipated effects, I have selected Alternative 2. Alternative 2 was selected because it best meets the purpose and need (*EA pages 6-8*). Alternative 2 also falls within the applicable legal framework, economic considerations and logistical concerns.

### 1. Improve Stand Growth and Promote Forest Health

Alternative 2 best meets this purpose and need by increasing growth of residual trees in final shelterwood removal units, reducing mortality from insects, potentially reducing wildfire severity, increasing average tree spacing, and increasing average diameter of thinning stands diameter.

Alternative 2 will increase growth of residual trees in final shelterwood removal units. Overstory trees in units proposed for final shelterwood removal are not meeting Forest Plan growth and yield objectives specified in the Willamette Forest Plan (*EA page 55*). The understory below these trees is showing about 40% less leader growth than if these trees were not competing with a remnant shelterwood overstory (*EA page 6*). Removal of the shelterwood trees will release young understory trees to grow. Shelterwood overstories are no longer needed to ensure seed tree establishment and protection. The understory trees on these shelterwood sites exceed 4.5 feet in height (*Forest Plan IV-76*) and the overstory is no longer needed to, "assure that [this] area can be adequately restocked within 5 years of the seed cut," (*Willamette Forest Plan IV-75*).

Future insect mortality, especially the threat from Western Spruce Budworm will be reduced by commercial thinning prescriptions. Stands proposed for thinning have a low resiliency to disturbance events such as insects, disease and wildfire. The watershed has recently experienced substantial defoliation from a Western Spruce Budworm outbreak beginning in 1987 and culminating in 1992. Commercial thinnings in these stands would reduce competition stress and develop single –storied stands which would both reduce the presence of disturbance agents resulting in lower rates of insect induced mortality (*EA pages 6, 65*).

Wildfire severity will be reduced in stem exclusion stands after commercial thinning by reducing ladder fuels, reducing harvest-generated slash with fuel treatments, and reducing canopy density by thinning the dominant trees (*EA pages 76-77*). Thinning will removal many smaller co-dominant trees which will break up the vertical fuel component and reduce the amount of ladder fuels in the stands. Harvest-generated slash will be reduced. Fire severity will be minimally affected by the removal of overstory trees in final shelterwood removal units because these trees are already widely spaced and the potential for additional drying of understory trees as a result of overstory removal is low (*EA page 76*).

Commercial thinning will increase average stand diameters as well as average stand spacing. Both these changes will improve stand resiliency by giving trees more room to grow, and reducing competition with other trees; especially in stem exclusion stands (*EA page 68*). Increased diameters will result from improved growth rates of remaining trees and by selective cutting of smaller co-dominant trees slated for commercial thinning which will leave a larger diameter class of remaining trees. Larger, more widely spaced trees will be more resistant to crown fire development under normal summer weather conditions.

**2. Maintain Road System at Appropriate Levels**

Alternative 2 will haul over the largest road system and harvest the largest volume which will provide more timber receipts for road maintenance than either Alternative 3 or 4. Haul routes will be brought up to specified maintenance levels and erosion potential will be reduced before timber hauling begins. If post-sale funding is available, several gate and berm closure devices will be re-established where they have become defective. Restoring the integrity of haul routes and barrier structures is part of the project design.

**3. Provide a Sustainable Supply of Timber Products**

Alternative 2 will produce almost twice the amount of timber as Alternative 3 or 4. This larger volume will help supply more than one year of the district's share of the Willamette National Forest's assigned sale quantity. The 19 MMBF projected for Presley's Twin timber sales will make a significant contribution to meeting the local and regional demand for timber.

The Environmental Assessment documents the analysis of three action Alternatives, along with the No-action Alternative to meet these needs. I have reviewed the EA, the related documents, and public input. My decision is based upon that review. I have found the analysis to be in full compliance with direction from the amended Forest Plan.

Documents in the project record are available for public review at the Detroit Ranger Station on Highway 22 in Detroit, Oregon.

# Other Alternatives Considered

In addition to the selected Alternative, I considered two other action Alternatives along with the no-action Alternative. There was one alternative considered but eliminated from detailed study (*EA page 21*).

## Alternative 1—No-Action

Under the no-action Alternative, current management plans will continue to guide management of the project area. No timber harvest treatments will be implemented. Forested stands will continue to develop under existing conditions and current stand density levels and growth trends will continue. None of the post-harvest projects listed in the EA nor the road closures, maintenance, or reconstruction will be implemented under the no-action Alternative.

I choose not to select the no-action Alternative because it does not meet the purpose and needs identified for the project. This alternative will not improve growth and vigor of stands, timber sale related maintenance of road systems will not occur and no timber products will be provided.

The no- action alternative will not improve stand growth nor will it promote forest health; rather stands will continue to stagnate and die of competition-induced mortality. In shelterwood stands growth of the developing understory will continue to be limited by remaining overstory trees. In

some cases these stands will continue slow progression from a fire condition class 1 to a condition class 2 or 3.  Over time, the increasing fuel load could be associated with greater fire intensity, severity, and rates of spread.

The no-action Alternative does not meet any of the identified needs for the project including the need to improve stand growth and promote forest health, maintain road systems at appropriate levels, and provide a sustainable supply of timber products.

## Alternative 3

Alternative 3 proposes to meet the purpose and need by 779 acres of forested stands in the Presley's Twin project area.  The expected timber volume from this Alternative is 10 MMBF.  This Alternative is differs from Alternative 2 in that it will implement only the commercial thinning prescriptions and not the final shelterwood removal.  This Alternative includes 6.51 miles of pre-haul maintenance and 19.84 miles of reconstruction.  There will also be 0.5 miles of temporary spur road reopening and 0.2 miles of temporary road construction.  Alternative 3 has the second lowest cost/benefit ratio, only 2% higher than Alternative 4 and 14% lower than Alternative 2.[1]  Net appraised value of this alternative is about half that of Alternative 2.

I choose not to select this Alternative because of the low harvest volume and lack of treatment in shelterwood stands and because it does not address the need to release the understory from competition which has now fully regenerated below existing shelterwood trees.  Leaving these overstory trees on site, would reduce growth of the developing understory.  Delaying the removal of overstory trees any longer would result in increased mechanical damage to the understory during harvest (*EA page 55*).

## Alternative 4

Alternative 4 proposes to meet the purpose and need by removing the shelterwood overstory on 889 acres of forested stands in the Presley's Twin project area.  The expected timber volume from this Alternative is 9 MMBF.  This Alternative is differs from Alternative 2 in that it will implement only the final shelterwood removal, regeneration harvest, and shelterwood creation prescriptions and not the commercial thinning.  This Alternative includes 7.83 miles of pre-haul maintenance and 28.76 miles of reconstruction.  There will also be 3.0 miles of temporary road re-opening and 0.4 miles of temporary road construction.  Alternative 4 has the lowest cost/benefit ratio, 16% lower than alternative 2.  Net appraised value of this alternative is about half that of Alternative 2.

I choose not to select this Alternative because of the low harvest volume and lack of treatment in commercial thinning stands and because it does not address the need to treat high-density stagnated stem exclusion stands.

---

[1] The cost/benefit ratio is defined as the gross value of the timber divided by all of the associated costs (including logging, road, fuel treatment, and post sale activities costs).  The higher the number in this ratio, the greater the timber economic benefit received per dollar spent on costs.

# Public and Government Involvement

The Presley's Twin Project has been listed in the Forest Focus – the quarterly schedule of proposed actions (SOPA) for the Willamette National Forest since July 2005 with the exception of a period from September through December 2005. The Willamette National Forest publishes the SOPT quarterly on the web and sends the document to over 100 individuals, groups, and industry representatives.

The scoping letter for Presley's Twin was mailed to the Confederated Tribes of Siltetz, Confederated Tribes of Grand Ronde, and the Confederated Tribes of Warm Springs on July 30, 2007. No comments were received from the tribes.

As part of the public involvement process, the agency contacted or held meetings with the Boy Scouts of America and the American Forest Resources Council as requested. Using both verbal and written comments solicited during project scoping from the public and other agencies, the interdisciplinary team developed a list of issues to be addressed in this assessment.

The EA was released for a 30-day comment period on July 30, 2007. Three groups submitted comments: Oregon Wild, Cascadia Wildlands Project, and the American Forest Resource Council. Cascadia Wildlands Project also contacted the district via phone and inquired about the project to clarify their questions and our intent. General discussion with Oregon Wild included the age of trees in riparian reserves, overall type of project and the process for treatment of temporary roads after the completion of harvest activities. Appendix A of this Decision Notice contains the responses to the comments contained in these comment letters.

## Comment Summary

During the 30-day EA comment period, three comments were received. Comments were submitted by the American Forest Resources Council (AFRC), Oregon Wild, and Cascadia Wildlands Project. Comments are addressed in Appendix A.

# Finding of No Significant Impact

After considering the environmental effects described in the EA, I have determined that these actions will not have a significant effect on the quality of the human environment considering the context and intensity of impacts (40 CFR 1508.27). Thus, an environmental impact statement will not be prepared. I base my finding on the following.

## Context

The selected Alternative is limited in geographic context (40 CFR 1508.27(a)). The area of proposed activity is relatively small when considered in a watershed perspective. Significant direct or indirect effects are not anticipated with the implementation of Alternative 2. Likewise, cumulative effects are expected to be negligible and are documented in the EA (*EA pages 67-184*).

# Intensity

Ten elements of impact intensity identified in 40 CFR 1508.27b have been considered in assessing the potential significance of project effects. They are as follows:

1. No significant adverse direct or indirect effects to the environment from this project were identified during the environmental effects analysis. No significant irreversible or irretrievable commitments of resources, such as loss of soil productivity, water quality, wildlife habitat, or recreational opportunities, will result from this project. As described in Chapter 3 of the EA, adverse effects and the reasons they are not expected to be significant include:

- Soils –little or no additional compaction or displacement will occur, adverse long-term impacts to soil productivity are not anticipated. Slope stability will remain stable with implementation of alternative 2, as a result . (*EA pages 131-133*).

- Water quality – A low risk of downstream effects to water quality exists due to the design criteria being prescribed (*EA page 146*).

- Fisheries – there is zero probability of measurable negative effects to occupied fish habitat. The magnitude of negative effects to fish habitat will be zero (*EA page 163*).

- Big Game – the cumulative effects on big game in the area are expected to be inconsequential (*EA page 88*).

- Survey and Manage Species – There will be no effects to Great Gray Owls. The likelihood of negative effects to Red Tree Voles is low because surveys were done to protocol and no active or inactive nest sites were found. There will be no effects to Crater lake tightcoil as a result of this project. All habitat areas have been buffered out of sale units (*EA pages101-102*).

- Proposed, Threatened, Endangered, and Sensitive Species – There will be no anticipated effects to the following animals or their habitat: Baird's shrew, California wolverine, Pacific fisher, Pacific shrews, Oregon slender salamanders and bald eagles. Pacific fringe-tailed bats may be affected if trees which have the potential to be used for nursery colonies are felled as hazards during harvest operations (*EA pages 105-106*). The project is not expected to compromise the functionality of any Northern Spotted Owl home ranges or create barriers to dispersal across the project area (*EA page 109*).

- Botanical Species – over the next 20-100 years, habitat for the majority of survey and manage sensitive botanical species will be enhanced. Stand treatments proposed in this project should help develop good habitat characteristics including development of understory vegetation, of large trees, snags, and downed woody material (*EA page 114*).

- Recreation – Any road maintenance related traffic delays will result in only relatively short term inconveniences to visitors. Duration of noise disturbance from any harvest unit will be relatively short. Noise is not expected to be disruptive to Camp Pioneer. Noise form harvest activities should not affect solitude in the wilderness. Effects to dispersed sites as a result of logging are not expected to be significant (*EA pages 166-167*).

- Heritage Resources – there are no direct or indirect effects expected from this project (*EA page 183*).

2. Significant effects to public health and safety will be prevented by paving the last section of the 2261 road up to the Camp Pioneer Boy Scout camp (*EA page 144*), ensuring traffic control is used during periods of active harvesting and high use at Camp Pioneer (*EA*

*page 145*), performing appropriate pre-haul maintenance (*EA page 9*), and analyzing and removing danger trees along haul routes (*EA page 152*).

3. The supporting documentation located in the EA and project record provides sufficient information to determine that this project will not significantly affect any known unique characteristics of the geographic area such as park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas such as historic or cultural resources.

   There are no park lands or prime farmlands in the project area. All wetlands will receive adequate protection buffers to avoid any disturbance from timber harvest. Road maintenance and reconstruction activities will employ Best Management Practices to protect downstream resources from impacts (*EA pages 23, 44-45*).

   Cultural resource surveys, for this and previous timber sales, located 16 heritage sites and 24 isolated finds. All sites will be protected from harvest activities and associated projects. Sites will be excluded from timber sale units (*EA page 183*).

4. The project is unlikely to have highly controversial effects. The nature of potential effects on the human environment from Alternative 2 is well established and not likely to be highly controversial. While the public may perceive some aspect of the project (e.g., shelterwood removal) to be controversial, there is no known scientific controversy over the effects which result from these harvest prescriptions.

5. The project effects do not entail uncertain, unique, or unknown risks. The effects on the human environment from Alternative 2 are not uncertain and do not involve unique or unknown risks. The silvicultural methods proposed for this project have been prescribed and successfully implemented in stand structures, plant associations and site conditions similar to those found in the Presley's Twin area (*EA page 66*). The action will not establish a precedent for future actions with significant effects, because it conforms to all existing Forest Plan direction and is applicable only to the project area.

6. No potentially significant adverse cumulative effects of the project have been identified (*EA, Chapter 3, and pages 66, 78, 81, 84-85, 87-88, 90, 92, 93, 95, 98, 100, 103, 106-107,109-110,116-117,112-123, 126-129, 139, 147-148, 151, 154,156-158, 161*).

7. This action will not cause loss or destruction of significant scientific, cultural, or historical resources. An appropriate review has been conducted by this undertaking (as discussed in Factor 3). Both previously known and unknown significant cultural sites discovered in field surveys will be protected. Because cultural resources will not be affected by this action there will be no significant adverse effect on districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places. (*EA page 161*).

8. The action will not adversely affect any endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973 (*EA pages 98, 132*).

   For the Northern Spotted Owl: The biological opinion for habitat modification in the Presley's Twin project area is 1-7-06-F-2179. Under this opinion, Presley's Twin timber sale will remove 22 acres of suitable (foraging) habitat. There will be no change to suitable (nesting) habitat. There are no restrictions in the biological evaluation which apply to the Presley's Twin sale.

For other Endangered or Threatened species, there is no expectation that the Presley's Twin project will result in adverse effects to either the species or their habitat (*EA appendix B page 2-3*).

9. The action will not violate Federal, State, and local laws or requirements for the protection of the environment. Applicable laws and regulations were considered in the EA.  The project is consistent with the Willamette National Forest Land and Resource Management Plan (*EA pages 184-185*).

# Findings Required by Other Laws and Regulations

This decision to implement Alternative 2 is consistent with the intent of the forest plan's long term goals and objectives listed on pages IV-2 to IV-44. The project was designed in conformance with land and resource management plan standards and incorporates appropriate land and resource management plan guidelines for Management Areas 11d, 14a and 15 where activities will occur implementing this decision (*EA pages 12-14*) (*Willamette National Forest Land and Resource Management Plan pages 207-209, 227-230, 233-240*).

This decision is consistent with all applicable Acts and Regulations such as the National Forest Management Act of 1976, National Environmental Policy Act (NEPA) of 1969, Endangered Species Act of 1973, Clean Water Act of 1972 and section 319 of the 1987 CWA, Civil Rights Act of 1964, Title VI and Environmental Justice Executive Orders 11988 and 11990, The Preservation of Antiquities Act of June 1906 and the National Historic Preservation Act of October 1966, Executive Order 12962 on Recreational Fishing, and Executive Order 13186 on Neotropical Migratory Birds. (*EA, Chapter 3*).

On  July 24, 2007, the Under Secretary of the Department of Agriculture signed a new Survey and Manage record of Decision Record of Decision to Remove the Survey and Mange Mitigation Measure Standards and Guidelines from Forest Service Land and Resource Management Plans Within the Range of the Northern Spotted Owl that removed the survey and manage requirements from all the National Forests' land and resource management plans within the range of the northern spotted owl.  However, since the court in *Northwest Ecosystem Alliance et al v. Mark Rey et al, Civ. No. 04-844, Western District of Washington* has not yet granted the government's motion to lift the modified October 11, 2006 injunction, I have designed this project to be consistent with the 2001 Survey and Manage ROD as modified by subsequent annual species reviews as allowed by the modified October 11, 2006 injunction."  Red tree vole surveys have been completed for harvest units in the Presley's Twin project and are discussed in the EA (*EA pages 94-95*). No active or inactive red tree vole nests were located so no additional protection measures are included.

The selected alternative is also consistent with the Aquatic Conservation Strategy as described in the 1994 NWFP ROD.  In making my finding of consistency I relied on an evaluation of the project's consistency with the nine ACS objectives (*EA appendix E*).  In addition I considered the findings of the 1996 Upper North Santiam Watershed Assessment that are relevant to the project area.

 As required by 36 CFR 219.35, I have considered the best available science in making this decision. The project record demonstrates a thorough review of relevant scientific information, consideration of responsible opposing views, and, where appropriate, the acknowledgment of incomplete or unavailable information, scientific uncertainty, and risk. Some studies cited in the EA from the last two years include Thompson et al (*EA page 68*), Mellen et al (*EA page 88*), England et al (*EA page 108*), and USDA (*EA page 164*).

I have considered all applicable laws, regulations and policies which is covered in the regulatory framework for each resource area (*EA pages 10, 69,84,114,120,124,149,163, 174,182,184-185*) and will ensure that all direction will be followed in the implementation of this project.  I considered the requirements of the Willamette National Forest Land and Resource Management Plan and the Northwest Forest Plan, economic conditions and analyses, and logistical and operational concerns.

# Administrative Review or Appeal Opportunities

This decision is subject to administrative review (appeal) pursuant to 36 CFR Part 215. Appeals can be submitted in several forms, but must be received by Forest Supervisor Dallas Emch, the Appeal Deciding Officer, within 45 days from the date of publication of notice of this decision in the Statesman Journal, Salem, Oregon. The publication date in the Statesman Journal, newspaper of record for the Detroit Ranger District, is the exclusive means for calculating the time to file an appeal. Attachments received after the 45 day appeal period will not be considered. Those wishing to appeal this decision should not rely upon dates or timeframe information provided by any other source.

## Appeals may be

### Mailed

Appeal Deciding Officer, Dallas Emch, Forest Supervisor; ATTN: Appeals, 211 E 7th Avenue; Eugene, OR 97440.

### Emailed

appeals-pacificnorthwest-willamette@fs.fed.us  please put "APPEAL" and "Presley's Twin Decision" in the subject line.

Electronic appeals must be submitted in a format such as an email message, plain text (.txt), rich text format (.rtf), or Word (.doc) to the email address above. In cases where no identifiable name is attached to an electronic message, a verification of identity will be required. A scanned signature is one way to provide verification.

### Hand Delivered

Willamette National Forest, Supervisor's Office at 211 E. 7th Ave, Eugene, OR 97401, between the hours of 8:00 am and 4:30 pm, M-F.

## Faxed

Willamette National Forest, Supervisor's Office, ATTN: APPEALS at (541) 225-6222.The notice of appeal must meet the appeal content requirements at 36 CFR 215.14.

# Contact Person

For further information on this decision, contact Christy McDevitt, IDT Leader, HC 73, Box 320, Mill City, OR 97360. Phone: (503) 854-4228.

Copies of the Environmental Assessment and this Decision Notice can be found on the Willamette National Forest Website at:
http://www.fs.fed.us/r6/willamette/manage/nepa/current_detroit.html

# Implementation Date

As per 36 CFR 215.9, if no appeal is received, implementation of this decision may occur on, but not before, the 5th business day following the close of the appeal filing period (215.15). When an appeal is filed, implementation may occur on, but not before the 15th business day following the date of appeal disposition (36 CFR 215.2).


___*/s/ Paul Matter*___                    ___*10/11/2007*_

PAUL MATTER                                            Date
District Ranger

# Appendix A – Response to Comments

A legal notice appeared in the Statesman Journal (the newspaper of record) on July 30, 2007 advertising the 30-day public review of the draft environmental assessment. In addition, letters were sent to interested parties. A draft environmental assessment was posted on the forest website and was available to download or view. It was also made available at the Detroit District Office or was mailed in hardcopy format to those who requested it. Comments were received from AFRC (Letter #1), Oregon Wild (Letter #2), and Cascadia Wildlands (Letter #3). Comments received during the 30-day public review of the draft EA and responses to those comments follow:

***Comment #1 –*** … we encourage the use of temporary roads to allow for appropriate harvesting systems. These temporary roads can always be removed, or made inaccessible to vehicles after logging operations (AFRC, Letter #1).

> ***Response to Comment #1 –***There are 4.1 miles of reopening of existing temporary spurs and construction of new temporary spurs proposed to access harvest units. After harvest activities, temporary spur roads will be waterbarred and scarified as needed. Waterbars will be keyed into the cut bank and have a clear outlet on the downhill side (*EA page 42*).

***Comment #2 –*** AFRC would like to continue to support the Detroit Ranger Districts' thinning treatments inside riparian reserves. We encourage the Forest Service to continue to use silvicultural thinning treatments in riparian reserves on future projects to accelerate the development of desired riparian conditions (AFRC, Letter #1).

> ***Response to Comment #2 –*** There are 220 acres of riparian reserve in the project area. Of this, about 60 acres will be treated with harvest prescriptions to help accelerate and promote long term characteristics needed by the dependent species utilizing the reserve (*EA page 134*).

***Comment #3 –*** Restrictions on season of operation have a cost to the purchaser and result in lower bids for stumpage. The district is encouraged to offer sales that allow winter harvesting on improved roads or allow for roads to be improved so winter harvesting can be accomplished (AFRC, Letter #1).

> ***Response to Comment #3 –*** Restrictions on season of operation are implemented judiciously to protect various resource values. There are three seasonal harvest restrictions associated with this sale including:

- Prohibit snow plowing, on the 2257 road north of the 2261 junction

- Prohibit hauling on the 2261 road from Camp Pioneer to highway 22 (Last weekend in June – Second weekend in August)

- Prohibit all operations on opening weekend (Sat/Sun) of the following hunting seasons: High Cascades Buck Rifle, Western Oregon Buck season and Elk season

Not all restrictions apply to every harvest unit so some units are available for harvest when others are not.  This area is amenable to winter logging and most units are not restricted for winter harvest as long as the purchaser agrees to complete additional work required to achieve desired maintenance objectives for hauling outside the normal operating season (*EA page 174*).  An economic analysis of the Alternatives showed Alternative 2 will generate twice as many jobs in the logging sector and timber products manufacturing sector as either Alternative 3 or 4.  Alternative 2 has the highest appraised value of all the action Alternatives because it has the most volume, value, and area treated with the most efficient logging methods (*EA page 178*).

**Comment #4 –** The Northwest Forest Plan articulates a need to protect and restore large trees, so why would we cut down the very thing we are trying to restore?  Old shelterwood cuts may not be "natural" but retaining the large tree structure will provide great ecological benefits… If there is a concern for competition within these stands, then thin the younger trees that lack the qualities that make great wildlife habitat and retain the most ecologically valuable large old-growth trees (Oregon Wild, Letter #2).

> **Response to Comment #4 –** The intent of matrix lands is not to maintain large old growth or natural trees.  Operations on these matrix lands emphasize timber production.  All requirements of the Northwest Forest Plan and Willamette Forest Plan will be met with implementation of Alternative 2 (*EA page 184*).  The Upper North Santiam Watershed Assessment (WA) addresses the need for retention of large trees.  The large tree issue is also addressed at the landscape level and is also being met by leaving trees for wildlife and in all riparian reserves on final shelterwood removal units.  Thinning the understory to improve growth rates of understory trees is not supported by research or experience and will result in reduced growth rates in the future.

**Comment #5 –** Ground-based logging, grapple piling, and subsoiling are all very bad for soil.  It is better to avoid soil impacts rather than cause impacts and then mitigate them.  There does not seem to be clear disclosure about the impacts [the] temporary roads will have on hydrological function in the planning area (Oregon Wild, Letter #2).

> **Response to Comment #5 –** ground-based logging including grapple piling and subsoiling disturbs very little soil and, when properly done, causes almost no soil disturbance and very little compaction (*EA page 17*).  Grapple piling requires only one pass of the machine across the landscape, and the machine works while sitting on slash.  Extensive monitoring of grapple machine piling operations indicates that little or no additional compaction or displacement occurs (*EA page 131*).  To minimize the impacts to riparian areas, a buffer will be established along all streams and designated skid roads and crossing will be required.  This has effectively worked in past thinning sales.  Unit design minimizes the risks of routing water out of historic flow patterns, by designating skid trails within the timber sale contract.  Impacts of temporary roads on hydrologic function are discussed in Chapter 3.10.4 (*EA pages 137-138*).

**Comment #6 –**Competition and non-competitive mortality are important ecological processes that help develop high quality late successional habitat, such as snags and down wood. Thinning will truncate this process by capturing and delaying mortality thereby degrading the quality of future habitat (Oregon Wild, Letter #2).

> ***Response to Comment #6 –*** The number of live green trees and snags being left meets forest plan standards and guides (*EA page 21*). In some scenic retention areas this is as many as 10 to 15 per acre (*EA page 171*). These trees will provide legacy structures. Retained live green trees will provide legacy structures, snag, and downed wood habitat as these stands continue to develop.

**Comment #7 –** Thinning mature forests in riparian reserves is allowed only if "needed" to attain ASC objectives, but all the ASC objectives can and will be attained without intervention, so thinning is not "needed" in riparian reserves, and such thinning is in fact not permitted. Thinning mature forests will in fact impair the attainment of certain ASC objectives like large wood and viable populations of wildlife (Oregon Wild, Letter #2).

> ***Response to Comment #7 –*** I agree, not all areas warranted management at this time; some are developing needed characteristics naturally. Of the 220 acres in riparian reserves in the project area, only 60 acres (27%) are being treated. Management of the riparian reserves will protect and enhance the aquatic and wildlife dependent species and achieve the Aquatic Conservation Strategy Objectives (ASCO's) at the 5th field, project and landscape levels (*EA page 147*).
>
> Fire-regenerated riparian reserve stands proposed for entry needed stocking control to acquire vegetation characteristics needed to attain Aquatic Conservation Strategy Objectives. These stands have all had at least one previous harvest entry (*EA page 124*). Your determination of "natural" stands does not include these previous entries or the management that has prevented fire from naturally thinning the stand in question. It is the intent of the Northwest Forest Plan ASC Objectives to consider all factors that have attributed to conditions that prevent the attainment of the desired objectives.

**Comment #8–**This project removes various habitat components that are under-represented regionally (due to past over-cutting) and locally (due to the B&B fire and insect defoliation). All mature trees must be retained as current green tree habitat and as future snag habitat. The B&B fire essentially stopped snag recruitment across a large area, which will result in a future snag gap (Oregon Wild, Letter #2).

> ***Response to Comment #8 –*** For all sub-drainages, the number of snags is well above the 80% tolerance level, meaning most wildlife populations are using areas with a similar number and size of snags (*EA page 90*). Large, high severity fires are part of the natural cycle in Wilderness lands. Any snag gap that may occur in recently burned fire areas will fall within the natural disturbance regime. Snags and dead trees created with the Presley's Twin project to Forest Plan Standards and Guidelines for wildlife will persist over the next 80 years in the project area at which time natural snag recruitment will occur.

**Comment #9 –**The prospect of the entire reserve system being eliminated on all western Oregon BLM lands should provide extra incentive to safeguard all remaining older forest on the district.  The Presley's Twin EA's failure to identify and evaluate the cumulative impacts of the project with the WOPR fails a basic tenet of the National Environmental Policy Act (Cascadia Wildlands, Letter #3).

**Response to Comment #9 –**The cumulative effects analysis completed as part of the Presley's Twin project considers relevant past, present and reasonably foreseeable future actions. For cumulative effects purposes, the BLM's proposed plan revision is not a reasonably foreseeable future action that I can analyze at this time because the BLM has not made a decision on what they are going to do.  The nearest section of BLM land is east of the Detroit district boundary and would not be included in the cumulative effects analysis area.  The biological opinion issued by the USFWS concluded that activities are not likely to jeopardize the continued existence of the spotted owl and are not likely to adversely modify spotted owl critical habitat (*Biological Opinion page 95*).

**Comment #10–**The Presley's Twin EA does not rigorously explore and objectively evaluate all reasonable alternatives.  Our scoping comments suggested a "plantations only" alternative that was disregarded by the Forest Service as it was perceived not to have met the purpose and need. At some point, the Forest Service abandoned its original plans that called for 800 acres of plantation thinning as part of the project (see Presley's Twin scoping notice).  Thinning 800 acres of plantations will generate volume and release suppressed trees without controversy. Alternative three and four of Presley's Twin are mere components of alternative two (Cascadia Wildlands, Letter #3).

> **Response to Comment #10 –** The EA considered four alternatives as well as one alternative considered but eliminated from detailed study.  The initial public scoping record from July 2005, did include 800 acres of **precommercial thinning** of managed plantations.  The 800 acres of precommercial thinning was included as part of the scoping notices as it was considered a reasonably foreseeable future activity.  Precommercial thinning about 900 acres of managed plantations is still planned with the Presley's Twin Project as a post-sale enhancement project (*EA appendix D, page 3*).  This project will be analyzed for NEPA consistency as part of a separate planning effort.

**Comment #11 –**The Presley's Twin Project will remove the remaining overstory trees left from past shelterwood harvests and will violate this standard and guideline of the Willamette Forest Plan to retain 15% of each area associated with logging in matrix lands (Cascadia Wildlands, Letter #3).

> **Response to Comment #11 –** Standards and guidelines for green tree retention as well as leave trees for wildlife, visual and hydrologic resources will be met with this project.  15% of each final shelterwood removal unit will be preserved in green tree retention areas (*EA page 21*).

**Comment #12 –** The EA never discloses how logging large, mature trees improves forest health by improving stands resiliency to disturbances such as wildfire and disease. The EA has not referenced any scientific documentation that shows how logging older trees that may have experienced western spruce budworm outbreaks will make the stands more resilient (Cascadia Wildlands, Letter #3).

> **Response to Comment #12 –** The EA fully discloses how this project will improve forest health (*EA pages 61-66*). References to relevant scientific information can be found on pages 64-65 and are included on page 188 of the Works Cited. Commercial thinning treatments will reduce tree density by removing smaller diameter, poorer growing trees and many of those affected by insects or disease pathogens. Trees that remain following treatment will generally experience increased diameter growth, and will be better able to maintain or increase the amount of live crown relative to the height of the tree. Tree vigor will be increased and lead to reduced mortality from insects and diseases. The removal of densely spaced, small diameter trees, in conjunction with fuels treatment, can reduce the severity of future wildfires. Canopy closure will be reduced following thinning and will permit increased sunlight to reach the forest floor. Increased sunlight will accelerate understory growth and developments of a second canopy layer of shade-tolerant species (*EA page 64*). This vertical diversity will develop as live green trees which will generally burn at lower intensities than the existing dead and diseased standing snags and downed woody debris.

# Appendix B – Proposed Action Map



Peter M.K. Frost, *pro hac vice*
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
Tel: 541-485-2471
Fax: 541-485-2457
frost@westernlaw.org

Marc D. Fink, *pro hac vice*
Center for Biological Diversity
4515 Robinson Street
Duluth, Minnesota 55804
Tel: 218-525-3884
Fax: 218-525-3857
mfink@biologicaldiversity.org

Lisa T. Belenky (CA Bar No. 203225)
Center for Biological Diversity
1095 Market St., Suite 511
San Francisco, California 94103
Tel: 415-436-9682 x 307
Fax: 415-436-9683
lbelenky@biologicaldiversity.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| CITIZENS FOR BETTER FORESTRY, et al. | ) | Case No: 3:07-cv-3831-MJJ |
| | ) | |
| Plaintiffs, | ) | **DECLARATION OF** |
| | ) | **KEVIN MUELLER** |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| AGRICULTURE, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————————— | ) | |

DECLARATION OF KEVIN MUELLER

I, Kevin Mueller, declare:

1.      I am the Executive Director of the Utah Environmental Congress ("UEC"), and reside in Salt Lake City, Utah.

2.      UEC is extensively involved in environmental issues concerning the management of the national forests in Utah.  Because of our substantial involvement and concerns regarding Utah's national forests, UEC provided comments on each of the recently proposed revisions to the National Forest Management Act ("NFMA") regulations.  UEC is also involved in the forest planning process for the national forests in Utah, and is regularly involved and provides comments regarding site-specific projects that are proposed on the national forests in Utah.

3.      The staff and members of UEC regularly use and enjoy the national forests in Utah for a variety of uses, including hiking, fishing, hunting, camping, photographing scenery and wildlife, and for engaging in other vocational, scientific, and recreational activities.  UEC's staff and members derive recreational, inspirational, religious, scientific, educational and aesthetic benefit from their activities within these national forests.  UEC's staff and members intend to continue to use and enjoy Utah's national forests frequently and on an ongoing basis in the future, including this winter and next spring and summer.

4.      When the Forest Service proposed major revisions to the NFMA regulations in 2000, UEC did not receive any notice concerning the agency's preparation of an environmental assessment for the revised regulations.  UEC only became aware that an environmental assessment had been prepared after viewing the assessment and related "decision notice" and "finding of no significant impact" on the Forest Service website *after* the public comment period for the proposed regulations had already expired.

DECLARATION OF KEVIN MUELLER

5.      UEC joined as a plaintiff in a lawsuit challenging the 2000 NFMA regulations. After the Ninth Circuit agreed that the Forest Service violated the National Environmental Policy Act in developing these regulations, and the Forest Service subsequently withdrew the regulations in the federal register, we assumed that the 2000 NFMA regulations would never be implemented.

6.      UEC also joined a number of other environmental groups in a judicial challenge to the 2005 NFMA regulations, in part because the Forest Service had again made major changes to the nationwide NFMA regulations without preparing an environmental analysis, as required by the National Environmental Policy Act, and without consulting with the expert agencies on threatened and endangered species, as required by the Endangered Species Act.

7.      In April, 2007, after the Forest Service was enjoined from implementing the 2005 NFMA regulations, we learned that the Forest Service had issued nationwide direction to all of its Regional Foresters to again implement the 2000 NFMA regulations.  We were not provided any advance notice or an opportunity to provide comments prior to the agency's reinstatement of the 2000 regulations.

8.      On May 25, 2007, the Forest Service signed the revised Decision Memo for the Bug Lake Salvage Project on the Dixie National Forest in Utah.  Exhibit A.  This Decision Memo states that because of the April 27, 2007, Forest Service direction to implement the 2000 NFMA regulations, the Forest Service was implementing the "transition provision" of the 2000 regulations for the Bug Lake project.  Id. at 1.  As result of the April, 2007, national direction and the reinstatement of solely the transition provision of the 2000 regulations, the Forest Service is only considering the best available science and is not insuring that the proposed

DECLARATION OF KEVIN MUELLER

project is in compliance with any substantive set of NFMA regulations.  *Id.*

9.     On June 15, 2007, the Forest Service signed the Decision Notice and Finding of No Significant Impact for the Mt. Dutton project on the Dixie National Forest in Utah.  Exhibit B.  As with the Bug Lake project, the Mt. Dutton Decision Notice states that because of the April, 2007, direction to implement the 2000 NFMA regulations, the Forest Service is only considering the best available science for the Mt. Dutton project.  *Id*. at 7.

10.     The Bug Lake and Mt. Dutton projects may be implemented at any time.  If these projects had been developed under the 1982 NFMA regulations, as opposed to solely the transition provision of the 2000 regulations, the Forest Service would have had to provide additional protection for fish, wildlife, and other resources, including insuring the viability of fish and wildlife populations.  See 36 C.F.R. § 219.19 (1982).  I am concerned that the interests of  UEC and its members will be harmed by the Forest Service's failure to insure the viability of wildlife species and compliance with the many additional provisions of the 1982 regulations prior to implementing these projects.

11.     In addition, the Forest Service has not prepared any environmental analysis pursuant to the National Environmental Policy Act concerning its decision to implement solely the transition provision of the 2000 NFMA regulations for site-specific projects across the National Forest System.  UEC is further harmed by not being able to be involved in such an environmental analysis, as required by the National Environmental Policy Act, and by not knowing the potential impacts of such a dramatic decrease in regulatory protection for our national forests.

DECLARATION OF KEVIN MUELLER

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 23rd day of January, 2008, in Salt Lake City, Utah.

/s/ Kevin Mueller
Kevin Mueller

(The filer hereby attests that Mr. Mueller concurred with the filing of this declaration, and his written concurrence is in my possession).

DECLARATION OF KEVIN MUELLER

# Revised Decision Memo
## BUG LAKE SALVAGE PROJECT

Escalante Ranger District
Dixie National Forest
Garfield County, Utah

## Project Area

The Bug Lake Salvage Project area is located northeast of Bug Lake on the Griffin Top area of
the Aquarius Plateau (see attached map) and approximately 15 miles northwest of Escalante,
Utah. The project area is approximately 220 acres at an elevation of 10,500 feet, on mainly level
to slightly sloping ground. The project area is just south of FR 31375 and west of FR 30140.
The project area contains a mixture of spruce, fir, and aspen, with meadows on three sides. The
area has been logged in the past. Spruce beetles have killed nearly all of the mature spruce. No
old growth is in the area. No treatments will occur within roadless areas. An existing
maintenance level 1 road (FR 31908) runs through the project area. An intermittent stream is
located outside the project area to the west.

The legal description for the project area includes parts of the NW ¼ of Section 14 and the SW ¼
of Section 11, T33S, R1W, of the Salt Lake Baseline meridian.

## Prior Decisions

The spruce stands associated with the Bug Lake project area were included in the Griffin Springs
Resource Management Project decision (2003), developed with an ecosystem approach and
designed to improve conditions of spruce, fir, and aspen stands, including old growth. The 10th
Circuit Court of Appeals ordered that decision vacated in The Ecology Center v. United States
Forest Service (2006). As a result, that decision cannot be implemented. In the eight years since
project planning began for the GSRMP, conditions within the area have changed substantially. A
spruce beetle epidemic has caused almost complete overstory mortality in the stand within the
Bug Lake project area. Consequently, the Dixie National Forest has focused this proposal on a
salvage operation for the approximately 220 acre Bug Lake project area within the former 11,835
acre Griffin Springs project area.

On February 9, 2007, Georgina Lampman, Escalante District Ranger, signed a decision
approving the Bug Lake Salvage project located on the Dixie National Forest in Garfield County,
Utah. The project and decision had been developed under the 2005 planning regulations at
36CFR 219. On March 30, 2007, the United States District Court for the Northern District of
California issued a decision enjoining the Forest Service from implementing the 2005 planning
regulations. On April 27, 2007, Forest Service direction was issued to implement the 2000
planning regulations, including its transition provisions as clarified by the 2004 interpretive rule.
To insure that this project would be in compliance with current regulations, the February 9, 2007,
decision was withdrawn.

The current regulations require that projects implementing land management plans and plan
amendments, as appropriate, must be developed considering the best available science. The

**Exhibit A**

analysis team has reviewed appropriate documents and substantiated that the best available science has been considered.

## PURPOSE AND NEED FOR THIS PROJECT

### The Purpose

Currently, spruce beetles are at epidemic levels on the Aquarius Plateau and have killed millions of spruce trees over the Dixie National Forest. Large scale overstory losses of the spruce component have occurred in the project area.

The purpose of the project is to salvage dead and dying spruce trees killed by spruce beetles. This project will recover timber while the value is still high. The proposed action is designed to return the spruce-fir forest structure (Forest Plan, IV-25, IV-115) and remove insect-killed and insect-susceptible timber on suitable forest lands (Forest Plan, IV-7, IV -16, IV-21).

### Identified Needs

Based on the described purpose, the following resource condition needs have been identified:

- Increased representation of young spruce-fir forest structure (Forest Plan, IV-21, IV-25, IV-115), and removal of insect-killed and insect-susceptible timber on suitable forest lands (Forest Plan, IV-7, IV-16, IV-21).

## THE DECISION

My decision is based on a review of the record. The record includes a thorough review of and consideration of best available scientific information, and a consideration of responsible opposing views. No incomplete or unavailable information necessary for this decision has been identified.

My decision considers the fact that the Bug Lake Salvage project is within the original GSRMP project area and that other projects have been proposed for future treatments within other areas of the GSRMP project area. Although the GSRMP 2003 decision was for an environmental impact statement, the findings of that NEPA analysis indicated no significant impacts under the Griffin Springs treatments. The NEPA analysis was affirmed by the United States District Court for the State of Utah (2005), and that court decision regarding the NEPA analysis was affirmed by the United States 10th Circuit Court of Appeals even though the Forest Service decision had been vacated (2006).

My decision further considers that the conditions and emphasis have changed such that the proposed action from the vacated GSRMP 2003 decision is no longer applicable for that area. Analyses by specialists include references to the resource information from the NEPA analysis used for the 2003 decision, because much of that information is still relevant to the Bug Lake Salvage project area. However, the Bug Lake Salvage project is distinct from the proposed action from the vacated GSRMP 2003 decision and other proposed projects in the GSRMP project area.

**Exhibit A**

## Project Design Features

Project design criteria represent standards established to protect Dixie National Forest resources. Project design criteria have been developed to meet the goals of the Dixie LRMP as well as other laws, regulations, and directives. While many of these project design criteria are included as standard operating procedure in all projects, each project typically includes design criteria that are project specific.

In this case, project design criteria include:

- Remove dead spruce while emphasizing the retention of all live trees, especially preserving clumps of live trees, young to mature in age classes, and care should be taken to protect them from logging operations. Retention of live trees with full foliage that extends closely to the ground is particularly valuable to the scenic resource.

- Follow the guidelines outlined in the goshawk amendment for snag retention and downed logs and woody debris.

- In the immediate foreground (0-300 ft) of FR 30140, cut stumps to approximately 6 inches when possible. Excess slash should be pile and burned, with the remainder scattered, and scorched ground seeded with approved native seed mixture.

- Minimize soil disturbance and barked tree stems by mechanized equipment. Rehabilitate landings, skid trails and other disturbed areas with approved native seed mixture.

## Proposed Action

The proposed action is comprised of three components.

### 1. Salvage of Dead and Dying Trees

The Escalante Ranger District proposes to treat approximately 220 acres of dead and dying spruce. Silvicultural treatments would consist of salvage of beetle killed spruce. Small amounts of subalpine fir that would likely be damaged during spruce removal would also be harvested. Slash will be lopped and scattered across the treatment area. Excess logs and landing slash material would be available for fuelwood or biomass product removal. Remaining slash accumulations at landings would be burned. If needed, erosion control would entail machine construction of waterbars on skid trails and roads. Harvest method would be tractor logging, including mechanical harvest equipment, and whole tree removal.

### 2. Access

The current transportation system is adequate to access all of the treatment area. The roads that will be utilized include:

  FR 30140 – Main Griffin Top road.
  FR 31375 – Road to Trail Lake. Road accesses the north end of the project area.
  FR 31908 – ML 1 road runs north and south through the project area.

Road # 31908 is currently closed to public traffic and would require re-construction to implement the project. The road would be closed again following implementation. Reconstruction would include removing brush within the existing roadway to a width of 16 feet and adding a 6 – 12

**Exhibit A**

inch cap of borrow material for a 12 foot wide roadbed. Borrow material would come from existing sources near the project area. The small inclusion shown on the west side of the general project area boundary is one of the possible borrow sites.

## 3. Brush Disposal

Management ignited fire, mainly pile burning, is proposed to reduce fuels as a result of logging activities. Excess logs and landing slash material would be available for fuelwood or biomass product removal. Remaining slash would be removed by burning slash piles on landings. Burning would be conducted in the winter months. Remaining slash would be lopped and scattered to a maximum depth of 24 inches. Some amount of lop and scatter may occur on all 220 acres. It is estimated that less than two acres would be affected by burn piles. Some fall burning may occur if site conditions allow.

Implementation of project activities is estimated to begin in fall 2007.

## Public Involvement

A list of Federal, State, and local government agencies, organizations and individuals consulted concerning this project is available at the Dixie National Forest Supervisors Office in Cedar City, Utah. A combined scoping and notice of opportunity to comment document was mailed to 85 individuals, agencies, and organizations on Aug 15, 2006. A legal notice to initiate a 30 day opportunity to comment period was published in the Spectrum newspaper on Aug 18, 2006. We received two letters during the 30 day comment period. The project was listed in the Schedule of Proposed Actions in October 2006.

## Reasons for Categorical Exclusion

Per 40CFR1507.3, in Forest Service Handbook 1909.15 Chapter 30 the Forest Service establishes categories of actions that do not individually or cumulatively have a significant effect on the human environment. Once the analysis establishes that this project is within a category and that no extraordinary circumstances exist, this proposed action may be categorically excluded from further analysis and documentation in an environmental impact statement (EIS) or environmental assessment (EA).

I find the proposed action can be categorically excluded from documentation in an EA or EIS, because it is within category 31.2(13), described in Forest Service Handbook 1909.15, "Salvage of dead and/or dying trees not to exceed 250 acres, requiring no more than ½ mile of temporary road construction," and no extraordinary circumstances exist.

## Finding that the Project is Within the Category:

Based on analysis of the proposed action, I have determined that the project is within category 31.2(13) of FSH 1909.15. The silvicultural system employed is salvage harvest, meeting the "salvage of dead and/or dying trees" requirement of the category. The treatment is estimated to be 220 acres, meeting the "not to exceed 250 acres" requirement of the category. The project activities will use existing roads -- FR30140, FR31375, and FR 31908, meeting the "no more than 1/2 mile of temporary road construction" requirement of the category.

**Exhibit A**

**Finding that No Extraordinary Circumstances Exist:**

Based on the analysis of the potential effects of the proposed action on the resource conditions listed in FSH 1909.15, Section 30.3, I have determined that no extraordinary circumstances exist. FSH 1909.15, Section 30.3, specifies that these resource conditions be considered to determine if extraordinary circumstances related to the proposed action warrant further analysis or documentation in an EA or EIS. These resource conditions and findings are:

**a. Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species.**

Finding: A Biological Assessment (BA) was completed for federally listed threatened and endangered plant and animal species. For those threatened or endangered wildlife species that occur or have suitable habitat on the Escalante Ranger District, the BA determined that the proposed action "may affect but would not likely adversely affect" the Bald eagle, and Mexican spotted owl. It would have "no effect" on the Utah prairie dog, Mojave Desert Tortoise, Virgin River Chub, California Condor, or the Woundfin. I received a letter on January 4, 2007 from the US Fish and Wildlife Service concurring with the determination made in the BA. It has been determined that the Bug Lake Salvage Project will have no effect on any population of federally listed plant species.

Biological Evaluations (BE) were conducted for sensitive plant and animal species. The BE for plants determined that the proposed action will have no effect on individual sensitive plants. The adverse impacts that may affect the persistence of these plant species have been avoided.

The BE for sensitive wildlife species indicates this project may impact the northern goshawk, three-toed woodpecker, peregrine falcon, and flammulated owl, but will not likely contribute to a trend toward federal listing or cause a loss of viability to the population or species. It has been determined that implementation of this proposal will have beneficial effects on peregrine falcons, and flammulated owl habitats.

**b. Floodplains, wetlands, or municipal watersheds.** None are located in the project area and the adjacent intermittent stream would not be affected.

**c. Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas.** None are located in the project area.

**d. Inventoried roadless areas.** The project does not occur within any Inventoried Roadless Areas.

**e. Research natural areas.** None are located in the project area.

**f. American Indians and Alaska Native religious or cultural sites.** No known sites are located in the project area.

**Exhibit A**

**g. Archaeological sites, or historic properties or areas.** A finding of no effect from this project on cultural resources has been made. The Utah SHPO has been consulted on this project.

The proposed action is within category 31.2(13) of FSH 1909.15, and the analysis of the potential effect of the proposed action on the resource conditions listed in FSH 1909.15, Section 30, lead to my determination that no extraordinary circumstances exist. Therefore, I have determined that the proposed action may be categorically excluded from further analysis and documentation in an environmental impact statement or an environmental assessment.

## Findings Required by Other Laws

The National Forest Management Act and accompanying regulations require that several findings be documented at the project level. Based on these findings, I have determined that the project is consistent with the National Forest Management Act and accompanying regulations. A summary of these findings are as follows:

- Forest Plan Consistency: This decision is consistent with direction contained in the Dixie National Forest Land and Resource Management Plan. Pages IV-7 & 8 of the Plan encourage the treatment of forested stands to maintain vigor and overall forest health.

- Consistent with the 2000 Scenery Management System amendment, management activities within the 2B management area should include practices aimed at restoring the landscape to a desirable visual quality.

- Consistency with Utah Northern Goshawk Amendment to the Dixie Forest Plan: This decision is consistent with the direction contained in the Utah Northern Goshawk Amendment (March 14, 2000). Pages 18-26 of appendix CC contain the standards and guidelines that programmatically amend the Forest Plan relative to management direction in northern goshawk habitat. The proposed action complies with all applicable standards and guidelines and contributes to maintaining or improving northern goshawk habitat within the project area.

- Vegetative Manipulation: The minimum specific management requirements for projects and activities that must be met in carrying out projects and activities for the National Forest System (NFS) are found at FSM 1921.12a and IAW 36 CFR 219.12(b)(2). Under 16 U.S.C. 1604 (g)(3), a Responsible Official may authorize site-specific projects and activities to harvest timber on NFS lands only where:

    1. Soil, slope, or other watershed conditions will not be irreversibly damaged.
    The Bug Lake Salvage hydrology/soils report indicates the project will not irreversibly damage soils or watershed conditions. The project area is mostly level to slightly sloping.

    2. There is assurance that the lands can be adequately restocked within five years after final regeneration harvest (FSM 1921.12g).

**Exhibit A**

The Bug Lake Salvage Project is not a final regeneration harvest. Natural regeneration is expected to adequately restock this treatment area within five years.

3.  Streams, streambanks, shorelines, lakes, wetlands, and other bodies of water are protected from detrimental changes in water temperatures, blockages of water courses, and deposits of sediment where harvests are likely to seriously or adversely affect water conditions or fish habitat.

The Bug Lake project area does not contain any streams, streambanks, shorelines, lakes, or wetlands.  The fisheries report also concluded that no fish habitat or aquatic biota populations will be affected.

4.  The harvesting system to be used is not selected primarily because it will give the greatest dollar return or the greatest unit output of timber.

Although the proposed action's system is to salvage the dead and dying trees while they still have their greatest economic value, it does not include harvest of green trees, and it does include design criteria generated for other resource purposes that preclude removal of all dead and dying trees.

## Administrative Review or Appeal Opportunities

This decision is subject to appeal pursuant to Forest Service regulations at 36 CFR 215. A 30 day comment period was provided for those interested in or affected by this proposal to give them an opportunity to make their concerns known prior to a decision being made by the Responsible Official.  It was provided pursuant to the July 2 and September 16, 2005, orders issued by the U. S. District Court for the Eastern District of California in Case No. CIV F-03-6386JKS. Individuals or special interest groups who submitted timely comments in compliance with 36 CFR 215.13 have standing to appeal.  Appeals must meet the content requirements of 36 CFR 215.14.

## Implementation

If no appeals are received, this decision may be implemented no sooner than five business days following the close of the appeal filing period.  If an appeal is received, implementation may begin 15 days following the disposition of all appeals.

## Contact Person

For further information contact Keith Harris, 1789 Wedgewood Lane, Cedar City, UT, 84720. (435) 865-3729.

_Georgina Lampman_                                    May 25, 2007
Georgina Lampman                                      Date
District Ranger
Escalante Ranger District

**Exhibit A**



## Legend

**Dixie National Forest**
**Escalante Ranger District**
**Bug Lake Salvage Project**
**Vicinity Map**

▨ Bug Lake Treatment Unit   ━━━ Unclassified Roads

━━━ Improved Roads   ━━━ Trails

═══ 4x4 Roads

N

Miles
0   0.25   0.5   1



**Southern Utah**
**Vicinity Map**

Hatch
Panguitch
89
Powell Ranger District
Junction
12
Escalante Ranger District
Project Area
Escalante



**Dixie National Forest**
**State of Utah**
**Vicinity Map**

St. George
Cedar City
Escalante
Richfield
Salt Lake City
15
70
80

**Exhibit A**

# DECISION NOTICE (DN)
## and
## FINDING OF NO SIGNIFICANT IMPACT (FONSI)

## Mt Dutton Vegetation Management Project

**USDA FOREST SERVICE**
**Powell Ranger District**
**Dixie National Forest**
**Garfield County, Utah**

**June, 2007**

## Introduction and Location

The USDA Forest Service, Dixie National Forest, Powell Ranger District has prepared an Environmental Assessment (EA) for the Mt Dutton Vegetation Management Project analysis area to disclose the project's foreseeable environmental effects for consideration in determining whether or not to prepare an Environmental Impact Statement. Mt. Dutton Vegetation Management Project EA is a site-specific analysis that discloses the effects of implementing the Proposed Action, Alternative A, or of taking no action at this time. An interdisciplinary team (IDT) made up of Dixie National Forest employees evaluated the likely environmental effects of these options and summarized them in the EA. This summary is supported by additional documentation contained in the project record.

This project is located approximately 15 air miles northeast of Panguitch, Utah, and is located on the Sevier Plateau (See vicinity map, DN page 17). The legal description for the project area includes parts of T31S, R2½W, Sections 32 & 33; T31S, R3W, Sections 34, 35, & 36; T32S, R3W, Sections 5, 6, & 7; T32S, R4W, Sections 1, 2, 10, 11, 12, 13, 14, 15, 16, 21, 22, & 23; SLBM, Garfield County, Utah.

The project analysis area is approximately 5,490 acres in size and is located in the upper drainages of Hoodle Creek, Willow Springs Creek, Forest Creek, Pine Creek, and North Fork Deep Creek.

**Exhibit B**

## Decision

This DN documents my decision to select the Proposed Action as described in the EA, (Chapter 2, pages 3-6):

**The Proposed Action Alternative**
The Proposed Action contains the following components: Harvest wood products, post-harvest burning and brush disposal, post-harvest reforestation, and travel management. (See Proposed Action maps, DN pages 18-21.)

### 1. Harvest Wood Products
Approximately 836 acres of spruce/subalpine fir stands dominated by dead trees are proposed for commercial harvest (salvage). Some green tree removal may be required to remove residual damaged or diseased trees. Treatment methods would include ground based logging and helicopter logging. Helicopter logging would occur on 278 acres and ground based harvest would occur on 558 acres. Approximately 9.7 million board feet would be removed.

Of the total 836 acres proposed for treatment, approximately 145 acres are located within the Deer Creek inventoried roadless area where previous construction of a forest road, and prior timber harvest activities have taken place.

### 2. Post Harvest Burning and Brush/Slash Disposal
Prescribed burning would be used on approximately 296 acres within the commercial harvest units prior to planting. Fire would be applied with drip torches, fusees, and flares. Burning would occur after timber harvest. Approximately 21 acres of log landings would be machine piled and burned. Post-treatment slash would be lopped and scattered on the 836 acres proposed for treatment. Prescribed burning would be controlled mainly through the use of existing roads, skid trails, and fuelbreaks created through logging. Hand fireline construction may be required during prescribed burning. A maximum of 3.9 miles of handline could potentially be constructed. Any handlines constructed would be less than 24 inches wide. These lines would be rehabilitated following the burn.

### 3. Post Harvest Reforestation
It is estimated that 427 acres would be planted. At the conclusion of harvest activities some areas may not meet fully stocked levels required to attain the desired future condition. To move the area towards the desired future condition and meet size class and species diversity objectives, understocked areas would be planted with Engelmann spruce to supplement the existing and expected natural regeneration of spruce. A certified silviculturist would determine the timing of supplemental planting. (Refer to the Prescribed Fire/Reforestation map, DN p. 20). Pre-commercial thinning would not occur with this decision.

**Exhibit B**

## 4. Travel Management

No new road construction is proposed. The existing transportation system would be used to access the areas proposed for treatment. Specific maintenance actions associated with this decision would include clearing and blading to re-establish a 12-14 foot wide running surface; improve drainage through construction of rolling dips, ditches, and culvert installations; and placing rock where needed to provide suitable traction and support for log truck traffic. Additional drainage features may be installed if necessary. Maintenance would occur on approximately 29 miles of roads. Road #30125 would be used as the main haul route.

To reduce road densities, road closures and decommissioning are proposed within the project area. The following table provides a description of the actions by road number that are incorporated as part of the Proposed Action.

**Table 2-1: Road closures and Decommissioning**

| SUMMARY TABLE OF ROADS | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Unauthorized | Forest Roads | | Proposed Action | | |
| Road Number | Total (miles) | Existing (miles) | Existing (miles) | Proposed (miles) | Open (miles) | Closed (miles) | Decommission (miles) |
| 30125 | 10.00 | | 10.00 | 10.00 | 10.00 | | |
| 30126 | 1.84 | | 1.84 | 1.84 | 1.84 | | |
| 30206 | 0.26 | | 0.26 | 0.26 | | 0.26 | |
| 30341 | 0.22 | | 0.22 | 0.22 | | 0.22 | |
| 30353 | 0.75 | | 0.75 | 0.75 | 0.75 | | |
| 30358 | 2.44 | | 2.44 | 2.44 | 2.44 | | |
| 30372 | 0.29 | | 0.29 | 0.29 | | 0.29 | |
| 30387 | 0.31 | | 0.31 | 0.31 | | 0.31 | |
| 30431 | 0.75 | | 0.75 | 0.75 | 0.75 | | |
| 30438 | 1.02 | | 1.02 | 1.02 | 1.02 | | |
| 30689 | 0.85 | | 0.85 | 0.85 | 0.85 | | |
| 31229 | 0.09 | | 0.09 | 0.09 | 0.09 | | |
| 31230 | 0.44 | | 0.44 | | | | 0.44 |
| 31231 | 1.28 | | 1.28 | 1.28 | 1.28 | | |
| 31232 | 0.25 | | 0.25 | 0.25 | | 0.25 | |
| 31232 | 0.63 | | 0.63 | 0.63 | | 0.63 | |
| 31233 | 1.43 | | 1.43 | 1.43 | | 1.43 | |
| 31234 | 0.25 | | 0.25 | 0.25 | 0.25 | | |
| 31234 | 0.50 | | 0.50 | 0.50 | | 0.50 | |
| 31235 | 0.13 | | 0.13 | | | | 0.13 |
| 31236 | 2.27 | | 2.27 | 2.27 | 2.27 | | |
| 31237 | 1.05 | | 1.05 | 1.05 | | 1.05 | |
| 31238 | 0.99 | | 0.99 | 0.99 | | 0.99 | |



**Exhibit B**

| | | Unauthorized | Forest Roads | | Proposed Action | | |
|---|---|---|---|---|---|---|---|
| Road Number | Total (miles) | Existing (miles) | Existing (miles) | Proposed (miles) | Open (miles) | Closed (miles) | Decommission (miles) |
| 31239 | 0.56 | | 0.56 | 0.56 | | 0.56 | |
| 31240 | 0.40 | | 0.40 | 0.40 | | 0.40 | |
| 31241 | 0.56 | | 0.56 | 0.56 | | 0.56 | |
| 31242 | 0.60 | | 0.60 | | | | 0.60 |
| 31235A | 0.49 | | 0.49 | 0.49 | | 0.49 | |
| U31560 | 0.26 | 0.26 | | | | | 0.26 |
| U31562 | 0.11 | 0.11 | | 0.11 | 0.11 | | |
| U31564 | 0.17 | 0.17 | | | | | 0.17 |
| U31565 | 0.03 | 0.03 | | | | | 0.03 |
| U31566 | 0.76 | 0.76 | | 0.76 | | 0.76 | |
| U3272 | 0.12 | 0.12 | | 0.12 | 0.12 | | |
| U3274 | 0.33 | 0.33 | | | | | 0.33 |
| U3275 | 0.29 | 0.29 | | 0.29 | | 0.29 | |
| U3276 | 0.04 | 0.04 | | | | | 0.04 |
| U3277 | 0.15 | 0.15 | | 0.15 | | 0.15 | |
| U3278 | 0.34 | 0.34 | | 0.34 | | 0.34 | |
| U3280 | 1.27 | 1.27 | | 1.27 | | 1.27 | |
| U3281 | 0.31 | 0.31 | | | | | 0.31 |
| U3285 | 0.24 | 0.24 | | 0.24 | | 0.24 | |
| U3286 | 0.05 | 0.05 | | 0.05 | | 0.05 | |
| U3290 | 0.12 | 0.12 | | | | | 0.12 |
| U3291 | 0.12 | 0.12 | | | | | 0.12 |
| U3293 | 0.07 | 0.07 | | | | | 0.07 |
| U3294 | 0.07 | 0.07 | | | | | 0.07 |
| U3295 | 0.14 | 0.14 | | 0.14 | | 0.14 | |
| U3352 | 0.21 | 0.21 | | | | | 0.21 |
| U3352 | 0.42 | 0.42 | | 0.42 | | 0.42 | |
| U3353 | 0.20 | 0.20 | | 0.20 | | 0.20 | |
| U3358 | 0.07 | 0.07 | | | | | 0.07 |
| U3360 | 0.14 | 0.14 | | 0.14 | | 0.14 | |
| U3361 | 0.10 | 0.10 | | 0.10 | | 0.10 | |
| U3363 | 0.05 | 0.05 | | | | | 0.05 |
| U3364 | 0.29 | 0.29 | | 0.29 | | 0.29 | |
| U3367 | 0.30 | 0.30 | | 0.30 | | 0.30 | |
| U3368 | 0.12 | 0.12 | | | | | 0.12 |
| U3369 | 0.05 | 0.05 | | | | | 0.05 |
| U34004 | 0.05 | 0.05 | | | | | 0.05 |
| U34030 | 0.16 | 0.16 | | 0.16 | | 0.16 | |
| | | | | | | | |
| Totals | 37.80 | 7.15 | 30.65 | 34.56 | 21.77 | 12.79 | 3.24 |

Table title (above): SUMMARY TABLE OF ROADS  (continued)

**Exhibit B**

Road closure methods include earth/rock barriers, while using topographic features and vegetation (including seeding with native seeds) to improve effectiveness. Gates and fences may be used to ensure effectiveness of closures.

In anticipation of this project, the Forest Service conducted a Roads Analysis Process (RAP) to help plan for necessary changes to the project area road system. The results of the RAP include proposals for road designation, closure, and decommissioning. This information was used to formulate the proposed action. For more detailed information, refer to the RAP which is available for review in the project record.

**Project Design Features for the Proposed Action**

**Related to Soil and Water:**
1. Site specific Soil and Water Conservation Practices (SWCP's), FSH 2509.22, appropriate for vegetation manipulation, timber harvest, and burning activities would be implemented.  These are included in Appendix A of the Hydrology Specialist Report.
2. Ground based skidding equipment will be restricted to slopes less than 40%. Helicopter logging may occur in all areas proposed for harvest.
3. No pile or broadcast burning would be allowed within 100 feet of perennial or intermittent channels. (See map of Spring and Stream Buffers located in the Hydrology Specialist Report.)
4. The wooden fence (Worm fence) adjacent to Willow Creek along Forest Road #30125 would be replaced or repaired if damaged during project implementation to prevent access to and use of the wet meadow from dispersed camping.
5. No ground based equipment would be allowed in the Hoodle Creek meadow.
6. Firelines constructed during the prescribed fire operations would be rehabilitated with water-bars and removing berms.
7. Ground based skidding equipment would be restricted to outside of a 100 foot buffer along Willow Creek. (See map of Spring and Stream buffers located in the Hydrology Specialist Report)
8. Ground based skidding equipment would be restricted to outside of a 150 foot buffer on Hoodle Creek, Forest Creek, Pine Creek and North Fork Deep Creek. (See map of Spring and Stream Buffers located in the Hydrology Specialist Report.)
9. Landings would not be located within defined stream buffers.(Hydrology specialist Report, Stream Buffer map)

**Related to Wildlife:**
1. The appropriate timber sale provisions will be applied and the operator will cease activities which "May Affect" threatened, endangered, or candidate species discovered within or adjacent to the project area during project layout

**Exhibit B**

or implementation until the potential affect is removed or until additional consultation with the USDI-Fish and Wildlife Service is conducted.

2. The appropriate timber sale provisions will be applied, and the operator will cease activities which "May Affect" any Forest sensitive species discovered within or adjacent to the project area during project layout or implementation until an assessment can be made to determine the impact and potential adverse effects to the species are removed.

3. The project will maintain big game hiding cover along roads in accordance with the Forest Plan (DNF S&G IV-34). In the proposed salvaged areas, hiding cover must be maintained on greater than 50 percent of the perimeter of openings along greater than 75 percent of the edge of arterial and collector roads. Along road edges where hazard trees are a concern, remove hazard trees while maintaining sufficient cover where available.

4. To retain and protect snags, all forested landscapes would be managed for no less than 300 snags per 100 acres in the spruce-fir cover type and 200 snags per 100 acres in the aspen cover type. Guidelines in the Utah Northern Goshawk Amendment to the Forest Plan (USDA Forest Service, 2000, page CC-21) would be followed. Live defective aspen trees such as those infected with heart rot and/or broken tops would be counted toward meeting the snag requirement.

5. To provide for the needs of a wide variety of wildlife, an average of 100 tons per 10 acres of woody debris in the spruce-fir cover type and 30 tons per 10 acres in the aspen cover type would be retained following the guidelines outlined in the Utah Northern Goshawk Amendment to the Dixie Forest Plan (USDA Forest Service, 2000, page CC 21-22). If goshawk nests are found, the requirements in the Dixie LRMP will be followed to protect the species.

6. If raptor nests are found within or adjacent to the project area, a non-disturbance buffer would be placed around the nest. Time periods and recommended buffer size would be applied as recommended by the U.S. Fish and Wildlife Service, USDI (Romin and Muck 2002).

7. Elk and Mule Deer- Because trees would be salvaged, timing restrictions would reduce the likelihood of impacts on elk and mule deer, by beginning activities after most calving and fawning has occurred and their young are able to move away from logging activities. Direct disturbance to elk, deer, and other species can be reduced with no harvest activities occurring between May 1 and July 1.

**Related to Recreation and Visuals:**

1. To maintain Scenic Integrity Objectives, stumps would be cut to 6 inches in height within 100 feet of designated trails (Jones Corral Trail #33078 and Mountain Springs Trail #33079); road #30125; and within 100 feet of road #30358 (This would apply only to the Proposed Action). Activity generated slash would be removed from within 100 feet on either side of the trail upon completion of harvest activities.

**Exhibit B**

**Related to Fuels Management:**
1. In all treatment areas slash would be lopped and scattered to a maximum depth of 24 inches.

**Related to Other Resources:**
1. If any cultural sites are identified during harvest activities, activities would cease and the Forest Archeologist would be contacted. This measure would be enforced through Timber Contract C provisions during commercial harvest activities.
2. During and following project implementation it may be necessary to alter livestock management through a change in grazing rotation system, salt locations, additional herding and/or rest. Monitoring will determine if changes are necessary.
3. Protect spring development and pipeline in Hoodle Creek by following soil and Water Design Feature #8.
4. To reduce the potential for noxious weed seed transport through equipment transfer, equipment coming in from outside the Dixie National Forest would be washed prior to entering the Forest.

## Prior Decisions

On February 23, 2007, Robert G. MacWhorter, Forest Supervisor, signed a decision approving the Mt. Dutton Vegetation Management project located on the Dixie National Forest in Garfield County, Utah. The project and decision had been developed under the 2005 planning regulations at 36CFR 219. On March 30, 2007, the United States District Court for the Northern District of California issued a decision enjoining the Forest Service from implementing the 2005 planning regulations. On April 27, 2007, Forest Service direction was issued to implement the 2000 planning regulations, including its transition provisions as clarified by the 2004 interpretive rule. To insure that this project would be in compliance with current regulations, the February 23, 2007, decision was withdrawn.

The current regulations require that projects implementing land management plans and plan amendments, as appropriate, must be developed considering the best available science. The analysis team has reviewed appropriate documents and substantiated that the best available science has been considered.

## Rationale for the Decision

The detailed analysis in the EA describes how each alternative affects various resources within the area. Based on my review of these effects, I have selected the Proposed Action with consideration for the following key factors.

**Exhibit B**

My criteria for making a decision on this project was based on how well the management actions analyzed in the EA meet the purpose and need of the project, and address issues that were raised during the public comment process. I considered the Dixie Land and Resource Management Plan (Forest Plan), and took into account competing interests and values of the public. I considered a variety of other environmental and social effects, as documented in the specialist reports and EA. I also considered responsiveness to issues raised through public involvement.

**Meeting the Purpose and Need:**
- The purpose of the Proposed Action is to return the forest structure to a live forest where a diverse mixture of conifer and aspen trees occupy at least 150 live trees per acre (Forest Plan IV-71, IV-86, IV-117). By providing approximately 9.6 million board feet of salvage timber for commercial sale, the area will provide commercial sawtimber and rapidly move towards reforesting areas affected by spruce beetle caused tree mortality.(EA Chapter 1, pages 3-5)
- The Proposed Action will reduce undesirable fuel buildup by a combination of post-treatment of slash (lop and scatter), prescribed burning, slash pile burning, and burning the log landings. (EA Chapter 1, pages 3-5).
- The Proposed Action will reduce open road density from 3.42 miles/square mile to 2.63 miles/square mile within the wildlife habitat effectiveness area (EA Chapter 1, page 4,5, and Wildlife Specialist Report, page 29)

The Proposed Action will move the project area toward desired conditions described in the Forest Plan and in the Mt. Dutton Vegetation Management Project EA.

**Consideration of issues:**
I have reviewed the IDT concerns and the public scoping comments and categorized the issues into three groups:

1. Significant issues requiring development of an alternative: There were two significant issues identified that required the development of an alternative. These two issues were combined into Alternative A.
2. Issues identified and addressed through project design features (PDF's): EA, Chapter 2, pages 9-11.
3. Non-significant issues: These issues were considered but determined to be outside the scope of the project, requests for information, or resolved through existing law, regulation or policy.

**Exhibit B**

The IDT identified two primary issues to address:

1. **Issue:** Additional harvest within the inventoried roadless area may further affect the roadless character, roadless qualifications, and wilderness attributes.
   **Measurement criteria:** Acres of harvest within the roadless area.

2. **Issue:** Road densities should be reduced to improve effectiveness of big game habitat.
   **Measurement criteria:** Miles per square mile of open road density.

Alternative A was developed to address these issues. Treatment methods would remain the same as the Proposed Action, but would exclude the harvest of 145 acres within the roadless area. Harvest would occur on 691 acres; helicopter logging on 218 acres, and ground based harvest on 473 acres. Approximately 8.0 million board feet of commercial sawtimber would be removed. Project design features, and monitoring described for the Proposed Action would be included. An additional 3.59 miles of road would be decommissioned.

I feel that all issues identified have been addressed and resolved and there are no significant effects or issues outstanding.

**Consideration of Other Resource Areas**
I considered effects to other resource areas analyzed by the IDT in the process of preparing the Proposed Action and identifying the consequences of the alternatives in the EA. I feel there are no significant effects to any resource noted below in the FONSI pages 13-15. This alternative is consistent with the Roads Analysis Process and Report (RAP) conducted for this project. (Located in the project record)

**Consideration of Public Comments and Concerns**
I believe we have kept our partners informed and involved with this project. I have considered all comments and opinions that have been received to date on this project in making my decision. We invited the interested public, other federal, state or local government agencies, the general public, and other groups and individuals interested in or affected by the project to review and comment on our initial proposal and the purpose and need for the project. I have reviewed all the public comments and find that all concerns and issues have been addressed. A summary of the public involvement for this project is in the EA, (Chapter 1, pages 5-6). The complete comment analysis is in the project record.

**Exhibit B**

## Consideration of Available Science

My decision is based on a review of the record showing consideration of the best available science. The record includes a thorough review of relevant scientific information, a consideration of responsible opposing views, and the acknowledgement of potential incomplete or unavailable information. An analysis of scientific information provided by the public is included in the project record and in the Vegetation and Wildlife Specialist Reports.

# Alternatives Considered in the EA

The analysis for the Mt Dutton Vegetation Management Project considered three alternatives in detail. The effects of these are discussed in Chapter 4 of the EA. Two additional alternatives were considered by the IDT, but not studied in detail. The rationale for elimination of these alternatives is discussed in the EA (Chapter 2, pages 2-3.)

## Alternatives eliminated from Detailed Study

- An alternative was considered that would have required construction of approximately two miles of new road in Pine Creek to provide roaded access to additional acres of dead spruce. The new road would have been located about 150-200 feet above the creek. Portions of the road would have been located on 50 to 80 percent sideslopes, requiring cutslopes from 8 to 25 feet high. Sections of roads on greater than 60 percent sideslope would require full bench construction causing sedimentation in the stream during and after construction, and limiting locations for landings. Cutslopes of this size are unstable and difficult to revegetate. Due to these concerns regarding steep slopes, effects to watershed and soils, this alternative was deleted from detailed study.

- An alternative that considered harvest with tractor based equipment only was considered. This alternative would partially meet the Purpose and Need, and would treat approximately 70% of the acres as compared to the Proposed Action. The effects of this alternative are similar to the Proposed Action and Alternative A without helicopter logging. Since helicopter logging can be accomplished with minimal additional environmental impacts (which are analyzed in Alternative A) and provide an opportunity to remove excess fuel loading in or adjacent to wet lands, riparian areas, roadless area, and steeper slopes, this alternative was eliminated from detailed study.

## Alternatives considered in detail

- The Proposed Action: The description is found in Chapter 2 pages 3-8, and summarized in Chapter 1, page 5.
- Alternative A: The description is found in Chapter 2, pages 6-7.
- No Action: The description is found in Chapter 2, page 3.

**Exhibit B**

**Discussion of Rationale**

During my deliberation regarding the selection of the Proposed Action I carefully considered all public comments. In particular, the public raised some points that I would like to address specifically.

**Roadless**:
My decision to salvage harvest dead spruce within the Deer Creek Roadless Area was arrived at after careful thought.  These primary elements most of which have been discussed within the project analysis and disclosure lead me to move forward with my decision.
- I am aware that the 2001 Roadless Rule has been reinstated. The action to enter a roadless area that has been substantially altered by development is clearly compliant with the roadless rule, 36 CFR 294.13 (a) (4). This action will not change any acres within the Deer Creek Roadless Area that truly have roadless characteristics. Road #30358 is currently in place and past harvest activities are clearly evident.
- I have read and understand the roadless effects analysis disclosed in the environmental assessment and specialist reports. It is clear the roadless character has been altered in the 274 acres included in this Proposed Action. There is nearly one mile of constructed road that accesses the proposed activities. This road was constructed for the Mount Dutton Timber Sale (TS). Approximately 40 acres within the Deer Creek Roadless Area were harvested in the early 1990's as part of the Mt. Dutton Timber Sale. The Decision Notice for that project was approved on August 1,1989 with harvest completion in 1994. These previously harvested acres are part of the 145 acres that are proposed for harvest with this decision. Skid trails, stumps, slash piles and landings are evident on the ground and past harvest activities are clearly visible. The entire 274 acres were included within the Mt. Dutton TS Area boundary (Mt. Dutton TS EA and associated maps, 1989).

**Old Growth**:
The public has become increasingly interested in management of old growth timber stands. I am aware that the Forest Plan has a minimum standard to retain seven to ten percent old growth by drainage. My decision to implement the proposed action will not cut any old growth.  This is a salvage harvest proposal within an area that has many hundreds of acres of dead spruce trees.  Old growth characteristics no longer exist within any of the planned harvest units because there are simply not enough large diameter living trees. Acres of old growth will not be changed with my decision. (EA Chapter 3, pages 2 and 3) and Vegetation Specialist Report page 2)

**Management Area 4B (MA 4B)**:
Public comment did question why salvage harvest of 143 acres has been proposed in MA 4B, specifically, when the Forest Plan discussed that 36,692

**Exhibit B**

acres are unsuitable for timber harvest. This is a timber suitability question regarding the appropriateness of timber production throughout the MA 4B area. I have considered the comments, researched policy, and have found there is a clear distinction when salvage harvesting is proposed. There is no intent to move these MA 4B acres to timber production emphasis. There is the intent to salvage harvest dead spruce trees within MA 4B. My research of the effects of this harvest affirm the soils are suitable (Soils Specialist Report, pages 4 and 5) and the harvest is compliant with wildlife habitat effectiveness (Wildlife Specialist Report, pgs 1 and 2). Because only salvage harvest is proposed, the Proposed Action is consistent with the requirements discussed at 36 CFR 219.12 (2) (ii) which allows for salvage sales or other harvest. Acres identified as "unsuitable" in the Forest Plan will not change, so adjustments to the Forest Plan are not necessary.

I have also carefully reviewed management area direction for MA 4B in order to verify that salvage logging is appropriate.  In order to develop vegetation characteristics that will result in more optimum wildlife habitat and create tree stands that can be better managed for specific size, shape, interspersion, crown closure, age, structure and edge contrast, I have determined that salvage harvest and tree planting is appropriate (Forest Plan IV-82).

**Road Density**:
I am making my decision realizing the road management actions will not result in an open road density of 2 miles per square mile within the wildlife habitat effectiveness area but will move us toward this guideline (Forest Plan IV-50). I am also aware that the Dixie National Forest is in the process of completing a motorized travel plan which will include the portions of the wildlife habitat effectiveness area beyond the project area.

I have considered the Forest Plan guidelines and have determined it is not necessary to meet the 2 miles per square mile of open road density guideline within the habitat effectiveness area in a single decision, but rather be able to demonstrate our actions are moving toward the desired road density. This decision reduces open road density in the wildlife habitat effectiveness area from 3.42 mi/sq mi to 2.63 mi/sq mi (EA Chapter 2, page 8 and wildlife specialist Report). The proposed action developed for the motorized travel planning process has been available for public review and if implemented will further reduce the open road density within the wildlife habitat effectiveness area. The Proposed Action for the Mt. Dutton Vegetation Management Project and actions proposed in the motorized travel planning process clearly demonstrate that open road density will continue to be reduced.

**Exhibit B**

**No Action and Alternative A.**
I considered the No Action Alternative, but I have not selected it because it does not meet the purpose and need of the project. I believe that the best way to meet the Forest Plan goals and the RAP is by implementing the Proposed Action.

I considered Alternative A, but have not selected it because it would only partially meet the purpose and need. The effects of this alternative are similar to the Proposed Action, except it does not propose any treatments within the 274 acres of the Deer Creek Roadless Area located within the project area, and decommissions an additional 3.59 miles of road. Forest road, #30358, currently extends 0.965 miles into the roadless area. This road was constructed, and the area was harvested during the early 1990's. The roadless characteristics have been altered by those activities as evidenced by stumps, slash, skid trails, landings, etc. within this portion of the roadless area. (EA Chapter 3, pages 17-18, and Chapter 4, pages 35-39).

## Public Involvement

The public was invited to participate in the project in the following ways (EA, Chapter 1, pages 5-6):

**Public Field Trip**
A public field trip was held on October 21, 2005. A flyer was mailed to 55 individuals, groups, and agencies inviting them to participate in a field trip to the proposed project area. The purpose of the field trip was to get public input prior to developing the Proposed Action. People attending the field trip included Forest Service personnel, two private citizens, and one state agency representative.

**Scoping**
On February 6, 2006, a scoping letter was mailed to the public providing detailed information on the Mt. Dutton Vegetation Management Project Proposed Action. The letter was mailed to 58 individuals and groups, including federal and state agencies, tribal governments, municipal offices, and businesses. A total of eight responses to this scoping letter were received with comments and/or requests to stay on the mailing list for this project. A comment analysis was conducted to identify issues with the Proposed Action and identify alternatives to the Proposed Action.

**Notice and Comment**
On August 11, 2006, a letter was mailed to individuals, groups, and agencies. This letter notified the interested parties of the formal 30-day notice and comment period for the Mt. Dutton Vegetation Management Project. A legal Notice was published in The Spectrum on August 17, 2006. Three letters and one verbal comment were received.

**Exhibit B**

A comment analysis was conducted on the comments received. The comment analysis, issue identification documentation, mailing lists and comments received are located in the project record.

**Dixie National Forest Website**
The initial scoping letter for this project, other project information and maps were posted on the Dixie National Forest website at the beginning of the scoping period at www.fs.fed.us/r4/dixie/projects/dutton/index. This information and the RAP have been available to the public for review since February 2006. The Notice and Comment document was also posted online during the Notice and Comment period. This project has been included on the Dixie National Forest Schedule of Proposed Actions (SOPA) since July 2005.

## Finding of No Significant Impact (FONSI)

Based on the interdisciplinary environmental analysis, review of specialist reports, review of the National Environmental Policy Act (NEPA) criteria for significant effects, and my knowledge of the expected impacts, I have determined that this action will not have a significant effect upon the quality of the human environment. Therefore, an Environmental Impact Statement is not needed. This determination is based on the following factors:

<u>**Context of the Project**</u>

This is a site-specific, local action. No significant effects are expected to occur (EA, Chapter 4).

<u>**Intensity of the Project**</u>

Intensity refers to the severity of impact. The following ten factors were evaluated in determining the intensity of the effects of this proposed action:

**1. My finding of no significant environmental effects is not biased by the beneficial effects of the action.** The effects described in the EA, Chapter 4 and specialist reports support this determination.

**2. The degree to which the Proposed Action affects public health or safety.** This action does not pose a substantial question of significant effect upon public health or safety. This project is designed to improve safety. (EA, Chapter 1, page 4.)

**3. Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.** There are no unique geographic characteristics such as historical or cultural resources, parklands,

**Exhibit B**

prime farmlands, Wild and Scenic Rivers, or ecologically critical areas in the project area or cumulative effects area that are significantly affected by the proposed action. This is documented in the EA, Chapters 3 and 4. There are no effects to wetlands (Hydrology Specialist Report page 12).

**4. The effects on the human environment are not likely to be highly controversial.** This is based on the analysis contained in resource specialist reports, effects disclosed in the EA and comments from other agencies and the public. It is my judgment there does not exist an unusual or high degree of controversy related to this project.

**5. The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.** There are no known effects on the human environment that are highly uncertain or involve unique or unknown risks. This project is similar to other vegetation management projects within the Dixie National Forest. All known effects are adequately discussed in the EA, Chapter 4 and in the specialist reports.

**6. The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.** The Proposed Action does not represent a precedent for future actions with significant effects or represent a decision in principle about a future action that may be implemented to meet the goals and objectives of the Forest Plan. The assessment is site-specific and the actions incorporate the Standards and Guidelines included in the Forest Plan. This is described in the EA, Chapters 1 and 2.

**7. Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.** There are no known significant cumulative effects associated with this project when considered in conjunction with other past, present or future projects. The EA, Chapter 4, and specialist reports describe the anticipated cumulative effects.

**8. The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.** There are no known cultural resource sites that would be significantly affected by this project. This is documented in the EA, Chapter 3, page 18.

**9. The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.** There are no known endangered, threatened, or sensitive plant or animal species within the project analysis area that will be adversely affected by the selected alternative. Relevant

**Exhibit B**

documentation is included in Chapter 3, pages 6-15 and Chapter 4, pages 21-29, in the Fisheries/Aquatic Biota Specialist Report, Wildlife Specialist Report, Biological Assessment (BA), USFWS concurrence with the BA, and Biological Evaluation (BE) located in the project record.

**10. The action will not violate Federal, State, or local law or requirements imposed for the protection of the environment.** Implementation of the selected alternative will not violate any Federal, State, or local law or requirements imposed for the protection of the environment.

## Findings Required by Other Laws and Regulations

### Forest Plan

The features of this decision have been evaluated against the goals and objectives of the Forest Plan. All management activities included in the decision are in compliance with the Forest Plan goals, objectives, and standards. No Forest Plan amendment would be required.

Other findings are documented in the EA, Chapter 4.

## Administrative Review or Appeal Opportunities

This decision is subject to administrative review (appeal) pursuant to 36 CFR Part 215. The appeal must be filed (regular mail, fax, email, hand-delivery, or express delivery) with the Appeal Deciding Officer, Intermountain Regional Office, 324 25th Street, Ogden, Utah 84401 (FAX: 801.625.5277). The office business hours for those submitting hand-delivered appeals are: 8am to 4:30pm, Monday through Friday, excluding holidays. Electronic appeals must be submitted in a format such as an email message, plain text (.txt), rich text format (.rtf), or Word (.doc) to: appeals-intermtn-regional-office@fs.fed.us. The appeal must have an identifiable name attached or verification of identity will be required. A scanned signature may serve as verification on electronic appeals.

Appeals, including attachments, must be filed within 45 days from the publication date of this notice in the newspaper of record (The Spectrum, St. George, UT). Appeals and attachments received after the 45-day appeal period will not be considered. Publication of this Decision Notice in the newspaper of record is the exclusive means for calculating the time to file an appeal. Those wishing to appeal this decision should not rely upon dates or timeframe information provided by any other source. The notice of appeal must meet the appeal content requirements at 36 CFR 215.14.

## Implementation

If no appeal is received, this decision may be implemented no sooner than 5 business days following the close of the appeal filing period. If an appeal is received, implementation may not occur for 15 days following the date of appeal

**Exhibit B**

disposition.  Implementation of this decision is expected to begin during the fall of 2007.

## Contact

A detailed record of the environmental assessment is available for public review at the Powell Ranger District office, 225 West Main Street, Panguitch, Utah 84759.   For additional information, contact Marianne Orton, Interdisciplinary Team Leader, at (435) 676-9360.

## Responsible Official and Signature

*Acting For* ~Kevin R. Schulkoski~

**Robert G. MacWhorter**
**Forest Supervisor**

Date  June 15, 2007

**Exhibit B**



**Exhibit B**



**Exhibit B**



**Exhibit B**



**Exhibit B**



**Exhibit B**

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and where applicable, sex, marital status, familial status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or part of an individual's income is derived from any public assistance program. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDAs TARGET Center at (202) 720-2600 (voice and TDD). To file a complaint of discrimination, write to USDA, Director, Office of Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410, or call (800) 795-3272 (voice) or (202)720-6382 (TDD). USDA is an equal opportunity provider and employer

**Exhibit B**

Peter M.K. Frost, *pro hac vice*
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
Tel: 541-485-2471
Fax: 541-485-2457
frost@westernlaw.org

Marc D. Fink, *pro hac vice*
Center for Biological Diversity
4515 Robinson Street
Duluth, Minnesota 55804
Tel: 218-525-3884
Fax: 218-525-3857
mfink@biologicaldiversity.org

Lisa T. Belenky (CA Bar No. 203225)
Center for Biological Diversity
1095 Market St., Suite 511
San Francisco, California 94103
Tel: 415-436-9682 x 307
Fax: 415-436-9683
lbelenky@biologicaldiversity.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| CITIZENS FOR BETTER FORESTRY, et al. | ) | Case No: 3:07-cv-3831-MJJ |
| | ) | |
| Plaintiffs, | ) | **DECLARATION OF** |
| | ) | **ANDY STAHL** |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| AGRICULTURE, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————————— | ) | |

DECLARATION OF ANDY STAHL

I, Andy Stahl, declare:

1.      I am the Executive Director for Forest Service Employees for Environmental Ethics ("FSEEE") and reside in Eugene, Oregon.

2.      FSEEE is made up of thousands of concerned citizens, present, former, and retired Forest Service employees, other government resource managers, and citizens working to forge a socially responsible value system for the Forest Service based on a land ethic that ensures ecologically and economically sustainable resource management.

3.      The members of FSEEE regularly use and enjoy the National Forest System for a variety of uses, including hiking, fishing, hunting, camping, photographing scenery and wildlife, and for engaging in other vocational, scientific, and recreational activities.  In particular, FSEEE members recreate and enjoy a variety of activities on the Land Between the Lake National Recreation Area in Kentucky and Tennessee.  FSEEE's members derive recreational, inspirational, religious, scientific, educational and aesthetic benefit from their activities within the National Forest System, including the Land Between the Lake National Recreation Area, and intend to continue to use and enjoy these national forests frequently and on an ongoing basis in the future, including this winter and next spring and summer.

4.      FSEEE has been involved and submitted comments on the various proposed revisions to the National Forest Management Act ("NFMA") regulations.  FSEEE is also involved and submits comments on various forest plan revisions and site-specific proposals on national forests across the country.

5.      One place where FSEEE has been extensively involved over the past few years is the Land Between the Lakes National Recreation Area in Kentucky and Tennessee, which is

DECLARATION OF ANDY STAHL

managed by the Forest Service.  On September 21, 2007, the Forest Service signed a decision to

continue the maintenance of "open lands" on the Land Between the Lakes Recreation Area,

meaning, in part, that the agency will allow the continuation of thousands of acres of commercial

farming.  FSEEE appealed this decision because the authorized commercial farming violates 36

C.F.R. § 219.27 of the 1982 NFMA regulations.  On December 6, 2007, however, FSEEE was

informed that our appeal was denied.  Exhibit A.  According to the Forest Service, even though

the Forest Service used the 1982 NFMA regulations to prepare the 2004 Plan for the Land

Between the Lake National Recreation Area, the 1982 regulations "are no longer in effect with

regard to projects implementing Forest Plans."  *Id*. at 7.

6.    If the Forest Service recognized that the 1982 NFMA regulations were in effect,

the agency would not be allowed to continue with the authorization of significant commercial

farming practices on the Land Between the Lakes Recreation Area pursuant to 36 C.F.R.

§219.27.  As a result, the agency's arbitrary decision to instead rely on the 2000 NFMA

regulations, even after it had already formally removed these regulations in the federal register, is

harming the environment and the interests of FSEEE.

7.    Additionally, the Forest Service has failed to prepare any environmental analysis

pursuant to the National Environmental Policy Act concerning its decision to implement solely

the transition provision of the 2000 NFMA regulations across the National Forest System, and

has not done anything to address the violations of the National Environmental Policy Act for the

2000 regulations, as identified by the Ninth Circuit in *Citizens for Better Forestry v. U.S. Dept.

of Agriculture*, 341 F.3d 961 (9th Cir. 2003).  FSEEE has thus been harmed by not being able to

be involved in such an environmental analysis, as required by the National Environmental Policy

DECLARATION OF ANDY STAHL

Act, and by not knowing the potential impacts of such a dramatic decrease in regulatory

protection for our national forests.

I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct.  Executed this 23rd day of January, 2008, in Eugene, Oregon.

/s/ Andy Stahl
Andy Stahl

(The filer hereby attests that Mr. Stahl concurred
with the filing of this declaration, and his written
concurrence is in my possession).

DECLARATION OF ANDY STAHL



| United States<br>Department of<br>Agriculture | Forest<br>Service | Southern Region | 1720 Peachtree RD., NW<br>Atlanta, Georgia 30309 |
|---|---|---|---|

<div align="right">

**File Code:** 1570-1<br>08-08-60-0010<br>**Date:** December 6, 2007

</div>

### CERTIFIED MAIL R.R.R.

Forest Service Employees for Environmental Ethics
ATTN: Mr. Andy Stahl
P.O. Box 11615
Eugene, Oregon 97440

> Re: Appeal 08-08-60-0010 of Area Supervisor William P. Lisowsky's September 21, 2007, Decision for Continued Maintenance of Open Lands Environmental Assessment on Land Between the Lakes National Recreation Area

Dear Mr. Stahl:

According to the authority granted me by 36 CFR 215, this letter contains my decision on your appeal of the Decision for Continued Maintenance of Open Lands on Land Between the Lakes National Recreation Area.

### BACKGROUND

On September 21, 2007, Area Supervisor Lisowsky signed the Decision Notice (DN) for this Project. The legal notice of the Decision was published in the Paducah Sun Newspaper on September 22, 2007, and it has been verified that you provided comments during the 30-day comment period as required for standing in the proposed action, thereby meeting 36 CFR 215.11, regulatory requirements for eligibility to file an appeal on this project. Therefore, your timely appeal was accepted on November 9, 2007.

The Land-Between-the-Lakes National Recreation Area notified us that you declined an offer to meet to discuss your issues on October 31, 2007. Therefore, we continued with our review of the issues in your appeal.

### RECOMMENDATION OF APPEAL REVIEWING OFFICER (ARO)

I received the ARO's recommendation that the Area Supervisor's Decision be affirmed. The ARO's recommendation is based on your issues and a review of the project record. A copy of that ARO recommendation is enclosed.

### RELIEF REQUESTED

Your appeal requests that the decision be withdrawn.



**Caring for the Land and Serving People**

Printed on Recycled Paper

**CONCLUSION**

My review of your appeal was conducted pursuant to, and in accordance with, 36 CFR 215.18 to ensure the analysis and decision are in compliance with applicable laws, regulations, policy and orders. I have reviewed the appeal record and the ARO's recommendation, which includes a discussion of the issues that were raised in your appeal. Based on my review, I conclude that the issues raised in your appeal selecting Alternative 2 for the Continued Maintenance of Open Lands Environmental Assessment (EA), have been adequately addressed by the Area Supervisor. Therefore I am affirming Area Supervisor Lisowsky's September 21, 2007, Decision.

This constitutes the final administrative determination of the Department of Agriculture.

Sincerely,

*Thomas A. Peterson*

for CHARLES L. MYERS
Appeal Deciding Officer
Regional Forester

Enclosure



| **United States**<br>**Department of**<br>**Agriculture** | **Forest**<br>**Service** | **Southern Region**<br>**George Washington/**<br>**Jefferson National Forests** | **Supervisor's Office**<br>**5162 Valleypointe Pkwy**<br>**Roanoke, VA 24019** |
|---|---|---|---|

**File Code:** 1570                                      **Date**  November 29, 2006
**Route To:**

**Subject:**  ARO Recommendation LBL Appeal 08-08-60-0010 Alternative 2
Continued Maintenance of Open Lands EA (Revised)

**To:**  Appeal Deciding Officer

This letter constitutes my recommendation for the subject appeal filed by Andy Stahl of
Forest Service Employees for Environmental Ethics (FSEEE), regarding Alternative 2
for Continued Maintenance of Open Lands EA on Land Between the Lakes National
Recreation Area.

I conducted my review pursuant to 36 CFR 215. The purpose of this review is to ensure
the analysis and decision complies with applicable laws, regulations, policies and
orders. I reviewed and considered each of the points raised by the appellant and the
decision documentation submitted by the Area Supervisor. I based my
recommendation upon my review of the Appeal and Project File, including but not
limited to the Decision Notice/Finding of No Significant Impact (DN-FONSI), Biological
Evaluation (BE) and Environmental Assessment (EA).

## ISSUES:

**Issue 1**       Whether the EA fails to disclose uncertainties regarding the use of
pesticides on human health and wildlife and whether the lack of certainty
requires the preparation of an EIS (Appeal A, pp. 1-3);

**Issue 2**       Whether the EA adequately discloses the effects of fertilizer (urea) and
pesticide application on amphibians and terrestrial environments (Appeal
B &C, pp. 4-5);

**Issue 3**       Whether the project complies with the 1982 NFMA regulations, specifically
36 CFR 219.27 (Appeal D, pp. 5-6); and

**Issue 4**       Whether the decision violates the Farm Security and Rural Investment Act
(FSRIA) (Appeal E, p. 6).

**DISCUSSION OF ISSUES**

**Issue 1**          **Whether the EA fails to disclose uncertainties regarding the use of
                     pesticides on human health and wildlife and whether the lack of
                     certainty requires the preparation of an EIS**

The appellant contends *"If the effects of a proposed action are uncertain, **that
uncertainty precludes the finding that the impact to the environment is not
significant, and, thus, an EIS must be prepared"** (Appeal, p. 1, emphasis from the
original).

The appellant contends *"[t]he Open Lands EA fails entirely to disclose known
uncertainties regarding the use of pesticides on human health"* (Appeal, p. 2).

The appellant contends *"[t]he data gaps and uncertainties ignored by the Open Lands
EA extend beyond human health to also include effects upon wildlife"* (Appeal, p. 3).

The level of analysis conducted through the pesticide risk assessments met or
exceeded the criteria established in existing CEQ regulations for Environmental Impact
Statements. "Risk Assessment of Pesticides Proposed for Use in the Land Between the
Lakes Openlands Program" located in Appendix 6.9 of the EA is the report on herbicide
effects. This report specifies chemicals permitted for use, the rates at which they are
evaluated for application, the method of application, and chemical behavior, for the
specified maximum application, in the environment. The information in this report, when
combined with data presented in the EA for potential sites of treatment, allows adequate
basis for a reasoned determination.

The risk assessments, as mentioned in the paragraph above, address data gaps and
uncertainties, to the extent possible without becoming encyclopedic in scope, or
incurring exorbitant expenses per CEQ regulations (40 CFR 1502.22, 1500.4 (b),
1502.22 (a), (b)). *"We have considerable experience with the types of activities to be
implemented. The effects analysis shows the effects are not uncertain, and do not
involve unique or unknown risk"* (DN/FONSI, p. 6). This statement includes
considerations of the context and intensity of the expected impacts of the alternative,
and considered whether an EIS is needed in the DN and FONSI.

The summary of environmental consequences, including risk assessments, were
developed using the best available science, theoretical approaches or research
methods generally accepted by the scientific community, as required by 40 CFR
1502.22 (3).

**Finding**

I find that the EA adequately discloses uncertainties regarding the use of pesticides on human health and wildlife.  Therefore, an EIS is not required.

### Issue 2    Whether the EA adequately discloses the effects of fertilizer (urea) and pesticide application on amphibians and terrestrial environments

The appellant contends *"[t]he revised Open Lands EA fails entirely to consider the scientific findings that Roundup and other pesticides harm amphibians in ways not studied by traditional lethal dose laboratory measurements"* (Appeal, p. 4). The appellant contends *"[a]lthough . . . scientific citations are included in the 'references' section of the EA, no mention is made of the articles or their findings in the body of the document. Simply citing a reference is insufficient to demonstrate that the Forest Service considered the study's data in reaching its 'finding of no significant impact,' especially where the study's conclusions contradict directly the agency's FONSI"* (Appeal, p. 4).

The EA provides a lengthy analysis focusing on the risk to amphibian populations on the LBL from fertilizer applied in agricultural fields (Section 3.4.5, p. 100-105). This section discusses *"nitrogen compounds including ammonium, ammonia, nitrite, and nitrate have found to increase mortality to amphibians larvae vs. controls when added to water in laboratory and mesocosm experiments"* EA p. 100), based on several scientific papers, including Watt and Jarvis (1997), Xu and Oldham (1997), Schuytema and Nebeker (1999), de Wijer et al. (2003), Ortiz, et al. (2004), and Smith, et al. (2005). The EA's analysis of effects to amphibians states *"[r]esults of scientific studies have been mixed"* (p.100). The EA states *"[g]enerally, these mortalities are only found at high levels of ammonium nitrate, rarely found in field conditions"* (p.101). The EA recognizes that *"[w]hile fertilizer may have a negative effect on some species of adult amphibians, these species are not likely to be found in cultivated fields at planting time when fertilizers are applied, preferring moist areas with leaf litter rather than dry, open fields"* (p.101). The EA identifies some potential for impact to amphibians and states *"[o]ther studies found that some amphibians avoid crossing agricultural fields, using drainage ditches or other moist areas for pathways [and w]hile some amphibians may disperse through fields, they are not likely to linger and therefore unlikely to suffer negative effects from fertilizer"* (p.101). The EA addresses the *"Effects of Lime and Fertilizer Application"* (Section 3.4.5, p. 100). Numerous studies are the bases for the information on the effects of fertilizer on amphibians. The EA lists these studies in the reference section (Section 5.0, p. 140) and the project file contains a document that lists whether a particular reference is available by hard copy or electronic file.

The EA addresses the effects of pesticides on Wildlife (Section 3.4.6, p.105-109). The EA defines wildlife as all non-domesticated mammals, birds reptiles, and amphibians living in a natural environment including game species and non-game species, etc. (p. 184). The EA states *"[t]he list of approved pesticides can be found in Appendix 6.9.* (p. 105). The EA states, *"[o]nly pesticides which have passed EPA, Forest Service, and*

*USFWS review are proposed for use"* (p.106).  The EA states the *"EPA conducts an intensive review of all pesticides prior to being granted a label for proposed uses and only EPA Approved pesticides will be considered for use"* (p.106). The EA states *"[h]erbicides are applied at the lowest rate effective in meeting project objectives and according to guidelines for protecting human (National Research Council 1983) and wildlife health"* (p.106). The EA states *"[t]he extensive pesticide review process results in the use of lower risk pesticides, and implementation of Area Plan standards and design criteria would provide additional protection when pesticides are used"* (p.107).

No requirement exists requiring reference material to be incorporated into the body of the EA or other project documents. Referenced material is researched and reviewed so the author better understands the Best Available Science in order to make recommendation on a project.  The author has the discretion to decide which documents are incorporated into a document or which are simply cited as referenced material.  All reference material is available to the Deciding Officer for review.

**Finding**

I find the EA adequately discloses the effects of fertilizer (urea) and pesticide application on amphibians and terrestrial environments.

**Issue 3**     **Whether the project complies with the 1982 NFMA regulations, specifically 36 CFR 219.27**

The appellant contends *"Corn and soybean farming requires the use of pest management strategies that are not, in the long term, ecologically acceptable and **compatible with the forest ecosystem** and the multiple use objectives of the plan." 36 CFR 219.27 (a) (3)* (emphasis added by appellant).  *"Far from being compatible with the forest ecosystem, the pest management system utilized in corn and soybean farming replaces the natural forest ecosystem altogether.  In fact, these pesticides are being used to prevent the natural establishment of the forest ecosystem"* (Appeal, p. 6).

Land Between the Lakes Protection Act of 1998, in addition to transferring administrative jurisdiction to the National Forest System, included direction *"to protect and manage the resources of the Recreation Area (LBL) for optimum yield of outdoor recreation and environmental education through multiple use management by the Forest Service"* (Title V, Section 503).  Emphasis for management included providing for *"diversity of native and desirable non-native plants, animals, opportunities for hunting and fishing, and environmental education"* (Title V, Section 511(b) (2) (c)).  The Act goes on to include direction for agricultural receipts in Sections 513(b) and 524(a).

The LBL Area Plan provides broad, strategic direction for managing the land and its resources.  Site-specific project decisions must be consistent with the LBL Area Plan, which was developed in accordance with the National Forest Management Act of 1976 (NFMA) as amended in 1982, its implementing regulations, and other pertinent guidance (LBL Area Plan, p. 7).

The LBL Area Plan includes Land Allocation Prescriptions with Geographical Desired Future Conditions (LBL Area Plan, p. 27-45), including direction for open lands management. In the Land Allocation Prescriptions for 1.A. General Forest Areas Emphasis, the LBL Area Plan states, *"[open lands management] will test and demonstrate sustainable open land management through native warm season grass restoration, maintenance of open lands, and agricultural practices and techniques"* (LBL Area Plan, p. 27). The Desired Condition of 1.A. General Forest Areas calls for *"[o]pen lands, which include cultivated fields, wildlife plantings, maintained grasslands, and hayfields, are dispersed across the landscape"* (LBL Area Plan, p. 28).

The LBL Area Plan includes Area Wide Goals and Objectives to help LBL reach the Desired Future Condition for the Land Allocation Prescriptions (LBL Area Plan, pp. 49-56). OBJ5i calls for project proposals to *"[m]aintain approximately 10,600 acres in open lands – cultivated and grassland cover types to – support game species, early successional species, and watchable wildlife. Approximately 1100 acres of this 10,600 will be converted from cultivated field to grassland within riparian corridors over a 10-year period to improve riparian functions"* (LBL Area Plan, pp. 53-54).

In the Purpose and Need for Action, the EA references Goal 5 of the LBL Area Plan as follows: *"Specifically, the LBL Area Plan provides direction to maintain approximately 10,600 acres in open lands- cultivated and grassland cover types in all prescription areas throughout LBL"* (p. 4). The EA references Goal 5, and specifically, OBJ5i to further tier to the LBL Area Plan (p. 182).

While the 1982 planning regulations were used to develop LBL's 2004 Area Plan, they are no longer in effect with regard to projects implementing Forest Plans (see the Interpretative Planning Rule, Federal Register, September 29, 2004, pp. 58055-58057). Therefore, the regulation referenced by the Appellant, 36 CFR 219.27 (1982), is not applicable to the Continued Maintenance of Open Lands Project.

**Finding**

I find the EA complies with the National Forest Management Act of 1976 and the 2004 Area Plan.

**Issue 4**    **Whether the decision violates the Farm Security and Rural Investment Act (FSRIA)**

The appellant contends *"[t]he Forest Service has and continues to enroll cropland acres at LBL in the direct and counter-cyclical payment program, in violation of FSRIA. Because the Forest Service is administered by the Secretary of Agriculture, it cannot be an eligible 'owner' of a farm under the FSRIA and thus national forest system lands are not eligible to enroll in FSRIA payment programs"* (Appeal, p. 7).

The DN/FONSI "[p]rovides for maintenance of approximately 6,610 acres of early successional habitats in the form of cultivated and grassland cover types, in the General Forest prescription areas throughout LBL. Cover types to be maintained include 2,100 acres of croplands, 880 of wildlife plantings, 1,330 acres of cold and warm season grass hayfields, 190 acres of old fields, and 1,270 acres of other grasslands" (p. 2). "These actions may be implemented using administrative tools such as cooperative agreements, contracts, stewardship agreements, special use permits, force accounts, etc" (EA, p. 5).

There is no language in the LBL Area Plan, the EA or the DN/FONSI indicating the exact manner in which the cultivated croplands shall be maintained. There is no decision as to whether the cropland will be enrolled in the FSRIA program. If a contractor or permitee enrolled in a payment program with Farm Services Agency (FSA), it would be an agreement between the contractor or permitee, and FSA, not the Forest Service.

**Finding**

I find the issue of whether the action complies with the FSRIA is outside the scope of analysis for this EA.

**RECOMMENDATION**

After reviewing the project record and considering each issue that has been raised by the appellant, I recommend that Area Supervisor William Lisowsky's September 21, 2007, Decision for Continuing Maintenance of Open Lands on Land Between the Lakes, be affirmed.

/s/ Henry B. Hickerson
HENRY B. HICKERSON
Appeal Reviewing Officer
Deputy Forest Supervisor

1  Peter M.K. Frost, *pro hac vice*
2  Western Environmental Law Center
   1216 Lincoln Street
3  Eugene, Oregon 97401
   Tel: 541-485-2471
4  Fax: 541-485-2457
5  frost@westernlaw.org

6  Marc D. Fink, *pro hac vice*
   Center for Biological Diversity
7  4515 Robinson Street
   Duluth, Minnesota 55804
8  Tel: 218-525-3884
   Fax: 218-525-3857
9  mfink@biologicaldiversity.org
10
11 Lisa T. Belenky (CA Bar No. 203225)
   Center for Biological Diversity
12 1095 Market St., Suite 511
   San Francisco, California 94103
13 Tel: 415-436-9682 x 307
   Fax: 415-436-9683
14 lbelenky@biologicaldiversity.org
15
16 Attorneys for Plaintiffs

17
18                    UNITED STATES DISTRICT COURT FOR THE
                        NORTHERN DISTRICT OF CALIFORNIA
19                          SAN FRANCISCO DIVISION

20
   CITIZENS FOR BETTER FORESTRY, et al.        )    Case No: 3:07-cv-3831-MJJ
21                                             )
              Plaintiffs,                      )    **[PROPOSED] ORDER RE:**
22                                             )    **PLAINTIFFS' MOTION FOR**
                                               )    **SUMMARY JUDGMENT AND**
23            v.                               )    **INJUNCTIVE RELIEF**
                                               )
24 UNITED STATES DEPARTMENT OF                 )
   AGRICULTURE, et al.                         )
25                                             )
                                               )
26            Defendants.                      )
                                               )
27 _____)
28

1
2
3
4
5

     The Court, having reviewed Plaintiffs' Motion for Summary Judgment and Injunctive Relief and the accompanying declarations and exhibits, as well as the responses and briefs submitted by Federal Defendants, and having heard oral argument on the motion, hereby GRANTS Plaintiffs' Motion for Summary Judgment and Injunctive Relief, and orders as follows:

6
7
8
9

     1.    Federal Defendants violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, by failing to provide public notice and an opportunity for public comment prior to issuing the April 27, 2007, decision to reinstate the 2000 Rule;

10
11
12

     2.    Federal Defendants violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, by failing to involve the public in its consideration and assessment of the environmental effects of the 2000 Rule prior to issuing the April 27, 2007, decision to reinstate the 2000 Rule;

13
14
15
16
17

     3.    On the basis of the APA and NEPA violations, and pursuant to the judicial review provisions of the APA, 5 U.S.C. §§ 701-706, the Federal Defendants' April 27, 2007, decision to reinstate the 2000 Rule is held unlawful and set aside, and Federal Defendants are enjoined from relying upon or implementing the 2000 Rule in any manner;

18
19
20
21
22

     4.    Federal Defendants shall comply with the 1982 National Forest Management Act ("NFMA") regulations, former 36 C.F.R. pt. 219 (Sept. 30, 1982), for site-specific projects and forest plan amendments and revisions, until such time as Federal Defendants may promulgate a revised rule that is in full compliance with the APA, NEPA, the NFMA, and all other applicable requirements of law.

23

     IT IS SO ORDERED.

24
25
26
27
28

Dated:_____

_____
UNITED STATES DISTRICT JUDGE